**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-3316
_____

UNITED STATES OF AMERICA,
Appellant

v.

JAMAR HUNTER

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2-19-cr-00635-001)
District Judge: Honorable Juan R. Sánchez
_____

Argued December 13, 2022
_____


Before: RESTREPO, McKEE and SMITH, *Circuit Judges*

(Filed: December 5, 2023)

Meaghan Flannery
Matthew T. Newcomer          **[Argued]**
Jennifer A. Williams
OFFICE OF UNITED STATES ATTORNEY
Eastern District of Pennsylvania
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
          *Counsel for Appellant*


Salvatore C. Adamo, Esq.          **[Argued]**
1866 Leithsville Road
#306
Hellertown, PA 18055
          *Counsel for Appellee*

_____

OPINION
_____

RESTREPO, *Circuit Judge*

Law enforcement officers conduct traffic stops every day. No matter how minor the apparent infraction, every traffic stop must comply with the Fourth Amendment. It wraps every person, and every traffic stop, with a cloak of constitutional protection. The Fourth Amendment also permits the consideration of officer safety when confronting a potentially dangerous situation. Weighing those concerns, we must decide whether the use of a criminal record check, lasting approximately two minutes, can be an objectively reasonable

safety precaution related to the mission of the traffic stop under *Rodriguez v. United States*, 575 U.S. 348 (2015) and the Fourth Amendment.

It can. We therefore will reverse the District Court's grant of the suppression motion and remand for further consideration.

## I.
## A.

This traffic stop, which lasted less than eight minutes in its entirety, began like many others—with a police officer spotting minor traffic violations.[1] On December 12, 2018, Pennsylvania State Trooper Galen Clemons stopped a rented Chrysler 300 in Ridley Township, Pennsylvania. Neither the reason for the stop nor the legality of the stop at its outset is disputed. Clemons traveled alone—without a partner or back-up—and approached the car to discover two occupants: the driver, Jamar Hunter, and a front seat passenger, Deshaun Davis.[2] After Hunter and Davis provided identification,

---

[1] The traffic violations included the following: (1) speeding (traveling at fifty-eight miles per hour in a thirty-five miles per hour zone); (2) changing lanes without signaling; and (3) crossing over a solid line while changing lanes.

[2] The District Court discredited Clemons' testimony regarding Hunter's nervousness and Davis' evasiveness, noting that "the dashcam video fail[ed] to support his description." J.A. 7 nn.3–4. The District Court also found much of Clemons' testimony to be "generalized" and "exaggerated." *Id.* Although we exercise plenary review on questions of law, the District Court's credibility findings merit deference. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)

3

Clemons returned to his patrol car to perform a routine license and warrant check, also known as a "CLEAN N.C.I.C." check.[3] This check revealed that both men had valid driver's licenses and no outstanding arrest warrants. It is at this point that Hunter alleges the mission of the traffic stop ended and Clemons no longer had constitutional authority to prolong the stop.

Immediately after the routine check, Clemons performed an additional check that extended the traffic stop: a computerized criminal history check, also known as a "Triple I" check.[4] He spent around five minutes conducting both checks in his patrol car, with the Triple I check taking approximately "a minute or two." J.A. 254. This computerized criminal history check revealed that both Hunter and the passenger had significant criminal histories, including firearm and drug trafficking convictions.

Armed with this information, Clemons returned to Hunter's car. The officer ordered Hunter out of the car so that he could perform a *Terry* frisk, during which he discovered a loaded Glock-45 semi-automatic handgun in Hunter's waistband. He immediately arrested Hunter. The entire traffic stop lasted less than eight minutes.

_____

(concluding that credibility determinations made by the trial judge demand great deference).

[3] "CLEAN N.C.I.C." refers to Commonwealth Law Enforcement Assistant Network National Crime Information Center.

[4] The Triple I check retrieves criminal records from the same network as CLEAN N.C.I.C.

**B.**

Following his arrest, a federal grand jury indicted Hunter for possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Hunter moved to suppress the gun seized from him during the traffic stop on the basis that Clemons' use of the Triple I check impermissibly exceeded the traffic stop's mission, and thus any evidence recovered after Clemons conducted the Triple I check should be suppressed under the Fourth Amendment. The District Court granted the suppression motion based on the following determinations: (1) Clemons lacked sufficient reasonable suspicion *before* conducting the criminal history check; (2) the criminal history check was unrelated to the traffic stop's mission; (3) the criminal history check prolonged the traffic stop; and (4) the criminal history check therefore impermissibly exceeded the stop's mission and violated *Rodriguez* and the Fourth Amendment. The Government timely appealed on two grounds: (1) the District Court erred when it applied a subjective standard of review; and (2) therefore erred as a matter of law in concluding that this criminal record check was an off-mission detour pursuant to *Rodriguez* and the Fourth Amendment.

We address both arguments in turn.

5

**II.**[5]
**A.**

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. A traffic stop, however brief, constitutes a seizure under the Fourth Amendment and is subject to review for reasonableness. *See Whren v. United States*, 517 U.S. 806, 809–10 (1996); *see also United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018). Courts must review reasonableness through an objective lens, *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), and should not consider the actual or subjective intentions of the officer involved, *Whren*, 517 U.S. at 813.

In granting the suppression motion, the District Court erroneously applied a subjective standard rather than the constitutionally required objective standard. Specifically, the District Court considered Clemons' subjective testimony that he routinely, but not always, performs the criminal history check during traffic stops. The District Court credited Clemons' testimony that he would sometimes employ this check "to bolster [his] reasonable suspicion." J.A. 25, 255. Grounding its reasoning in this subjective testimony, the District Court concluded that "[t]he criminal background check was thus not tied to the traffic stop's mission." J.A. 13.

---

[5] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231 and this Court has appellate jurisdiction pursuant to 18 U.S.C. § 3731. We review a district court's decision to grant a motion to suppress under a "mixed standard of review." *United States v. Tracey*, 597 F.3d 140, 146 (3d Cir. 2010). We review findings of fact for clear error but exercise plenary review over legal determinations. *Id.*

Clemons' subjective intent is immaterial and should not be considered when evaluating whether the use of the criminal history check, when viewed objectively, was justified under the circumstances. *Scott v. United States*, 436 U.S. 128, 138 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."). The District Court therefore erred as a matter of law, and we will reverse.

**B.**

We review de novo the question of whether the use of the criminal history check in this case was objectively reasonable and proper under *Rodriguez*. To be reasonable, a traffic stop must be justified at its inception and the officer's actions during the stop must be reasonably related to "the mission of the stop itself." *Rodriguez*, 575 U.S. at 356. *Rodriguez* defines a traffic stop's mission to include completing "tasks tied to the traffic infraction," such as issuing a traffic ticket, checking the driver's license and any outstanding warrants, and inspecting registration and insurance. *Id.* at 354–55. *Rodriguez* also permits the use of "certain negligibly burdensome precautions" when done to complete the mission safely. *Id.* at 356. Off-mission detours that do not address the basis for the stop or legitimate safety concerns, such as a dog-sniff[6] or extensive criminal history

---

[6] *See Rodriguez*, 575 U.S. at 355 ("A dog sniff . . . is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'") (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)).

questioning,[7] violate the Fourth Amendment when performed without reasonable suspicion.

In this case, the parties agree that the criminal history check does not qualify as a routine task tied to the traffic infraction, and the Government concedes that Clemons "had completed the tasks specifically tied to the traffic stop when he finished the computerized N.C.I.C. driver's license and warrant checks." Gov't Br. at 24. The Government therefore argues that the check was objectively reasonable under *Rodriguez* because it was part of the stop's mission due to officer safety.

Officer safety during a traffic stop has been a longstanding and recognized concern. *See*, *e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (recognizing "that traffic stops are especially fraught with danger to police officers.") (internal citation omitted). *Rodriguez* recognized this concern and went one step further by concluding that the "officer safety interest stems from the mission of the stop itself." 575 U.S. at 356. Our Court has adopted this rationale. *See Clark*, 902 F.3d at 410 ("Tasks tied to officer safety are also part of the stop's mission when done out of an interest to protect officers.").

*Rodriguez* explained that "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely" and implied that conducting criminal record checks could be done in furtherance of officer safety. 575 U.S. at 356 (citing *United States v. Holt*, 264 F.3d 1215, 1221–22 (10th Cir. 2001) (en banc), *overruled on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005)). The fact that Hunter and Davis outnumbered Clemons enhances the

---

[7] *See, e.g.*, *Clark*, 902 F.3d at 410–11 (concluding that criminal history questioning, performed after criminal history query, violates the Fourth Amendment).

8

safety concerns we must consider. *See Maryland v. Wilson*, 519 U.S. 408, 413 (1997) ("[T]he fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer."). Viewing the circumstances as they existed at the scene of the stop, we conclude that it was reasonable for an officer to conduct this check pursuant to safety concerns.

Post-*Rodriguez,* the First, Fourth, Seventh, Eighth, Ninth, and Tenth Circuits have all concluded that a routine criminal record check during a traffic stop is lawful under the Fourth Amendment.[8] We agree that when "necessary in order

---

[8] *See, e.g.*, *United States v. Hylton*, 30 F.4th 842, 847 (9th Cir. 2022) (finding that while a felon registration check is a "measure aimed at detecting evidence of ordinary wrongdoing," a criminal history check, which only looks to whether "someone is a felon at all" is "supported by an 'officer safety justification'") (citation omitted); *United States v. Salkil*, 10 F.4th 897, 898 (8th Cir. 2021) (recognizing that "officers may complete 'routine tasks,' such as 'computerized checks of . . . the driver's license and criminal history'") (citation omitted); *United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020) (finding that "an officer's decision to run a criminal-history check on an occupant of a vehicle after initiating a traffic stop is justifiable as a 'negligibly burdensome precaution' consistent with the important governmental interest in officer safety") (citation omitted); *United States v. Dion*, 859 F.3d 114, 127 n.11 (1st Cir. 2017) (recognizing that "the Supreme Court has characterized a criminal-record check as a 'negligibly burdensome precaution' that may be necessary in order to complete the mission of the traffic stop safely") (citation omitted); *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (recognizing "'certain negligibly burdensome

to complete the mission of the traffic stop safely," a criminal history check is permissible and within the bounds of the Fourth Amendment. *United States v. Dion*, 859 F.3d 114, 127 n.11 (1st Cir. 2017).

We therefore hold that this criminal record check—which lasted approximately two minutes and was supported by objectively reasonable safety concerns—was a negligibly burdensome officer safety precaution that falls squarely within the confines of the stop's mission according to *Rodriguez.* However, we acknowledge that under other circumstances, a criminal record check may be unreasonable if it is more than negligibly burdensome and thus exceeds the stop's mission. *See Rodriguez*, 575 U.S. at 354 ("Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

As Judge McKee emphasizes in his concurring opinion, the U.S. Supreme Court has afforded "police officers unbridled discretion to order drivers out of their cars during traffic stops in the name of officer safety." *See* McKee concurring opinion § I.A & n.23 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)). Such a concern is understandable and is rightly accorded consideration as judges weigh whether a traffic stop comports with the strictures of the Fourth Amendment.

Unbridled discretion exercised by any officer of government will always be subject to mischief – or worse. It

---

precautions' that may not relate directly to the reason for the traffic stop, such as checking whether the driver has a criminal record or outstanding warrants") (citations omitted); *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015) (holding that a criminal history check is a permissible procedure "even without reasonable suspicion").

is incumbent upon us as judges to recognize that reality and to therefore be painstaking in our attention to all the evidence presented in traffic stop cases and the circumstances out of which they arise.

### III.

The District Court erred as a matter of law by applying a subjective reasonableness standard when evaluating whether the criminal record check in this case was part of the stop's mission. We will therefore reverse the District Court's order granting the motion to suppress and remand for further proceedings consistent with this opinion.

McKEE, *Circuit Judge*, concurring.

I join my colleagues' opinion in its entirety. I write separately, however, to emphasize the narrowness of our holding, to express concern about the likely consequences of our decision, and to examine aspects of our traffic stop jurisprudence, and *Rodriguez v. United States*,[1] that warrant further discussion.

After hearing the testimony of the arresting officer, the District Court held that the officer lacked reasonable suspicion to perform a criminal record check of Hunter and Hunter's passenger. We reverse because Supreme Court precedent indicates that the criminal record check was part of the mission of the original traffic stop. Therefore, the officer did not need reasonable suspicion to perform the criminal record check.

I nevertheless agree with the District Court that the officer lacked reasonable suspicion to further detain Hunter to conduct that inquiry. Dashcam footage of the stop and the District Court's opinion indicate that Hunter is Black. If Hunter had been White, I am not at all convinced that the officer would have checked Hunter's criminal history after confirming Hunter had a valid driver's license, registration, and insurance. As I shall explain, numerous studies support my suspicion. Although there is no way to address the disparate treatment Hunter may have been subjected to under our current Fourth Amendment jurisprudence, it still merits discussion.

**I.**

Our holding recognizes that police have limited discretion to extend a traffic stop for "a minute or two"[2] to conduct a criminal record check in the interest of officer safety.

---

[1] 575 U.S. 348 (2015).

[2] Majority Op. at 4; *see also id.* at 9.

1

As my colleagues and I stress, this record check lasted no more than two minutes. Extending this traffic stop for that length of time is consistent with the Supreme Court's opinion in *Rodriguez.* There, the Supreme Court explained that an officer may take "negligibly burdensome precautions" to complete a traffic stop safely[3] but did not specify when such precautions become more than negligibly burdensome and thus inconsistent with the limitations imposed by the Fourth Amendment.

It is important to note that studies have shown that police tend to subject motorists of color to more burdensome procedures than their White counterparts. Our jurisprudence has rarely recognized or addressed this unfortunate reality.

**A.**

Traffic stops are the most common form of involuntary contact civilians have with police. Indeed, in any given year, "between 7% and 10% of adults" in the United States "are

---

[3] *Rodriguez*, 575 U.S. at 356. Prior to *Rodriguez*, the Supreme Court described negligibly burdensome precautions as "de minimis" or "minimal" intrusions. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997). The Supreme Court has explicitly recognized only two de minimis intrusions: ordering a vehicle's driver, *see Mimms*, 434 U.S. at 111, and a vehicle's passengers, *see Wilson*, 519 U.S. at 415, to get out of the vehicle during the stop. And, before today, we had recognized only one additional de minimis intrusion: ordering a vehicle's occupants to remain inside the vehicle and to keep their hands raised throughout the stop. *See United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997).

stopped by the police [while driving] at least once."[4] Moreover, police have nearly unlimited discretion to initiate traffic stops.[5] One researcher has concluded, "[i]f an officer follows any motorist long enough, the motorist will eventually violate some traffic law" and could, therefore, be subjected to a stop "almost anytime, anywhere, virtually at the whim of police."[6]

The burden of these stops falls disproportionately on drivers of color. Indeed, a significant volume of recent research shows that "police treat drivers of color differently than white drivers."[7] Whether intentionally or not, "police are more likely to subject drivers of color to stops, searches, and other coercive actions compared to white drivers," and this disparate treatment is not explained by differences in behavior or circumstances.[8] Of course, each police department is different, and I caution against painting with too wide a brush. Nevertheless, studies have consistently shown that racial profiling by police is "relatively common."[9]

---

[4] Kelsey Shoub, *Comparing Systemic and Individual Sources of Racially Disparate Traffic Stop Outcomes*, 32 J. PUB. ADMIN. RES. & THEORY 236, 241 (2021).

[5] *See Whren v. United States*, 517 U.S. 806, 813, 819 (1996) (permitting stops based on probable cause of a traffic code violation, even when the traffic code violation is a pretext for the stop).

[6] Stephen Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Stops and Racial Profiling*, 73 STAN. L. REV. 637, 641 (2021) (internal quotation marks and brackets omitted).

[7] *Id.* at 657.

[8] *Id.*

[9] *Id.* at 663.

For example, one recent study analyzed traffic stop data from jurisdictions across the country and concluded that a driver's race influences police to initiate traffic stops.[10] The study reached this conclusion by comparing stops made before dusk, when a driver's race is readily apparent, to stops made after dusk, when a driver's race is more difficult to observe.[11] Even after controlling for location and for differences in traffic patterns and police deployment at different times of day, the study found that drivers of color were more likely to be stopped before dusk than they were after dusk—that is, drivers of color were more likely to be stopped when their race was apparent.[12]

Another study has found that drivers of color are more likely to be subjected to pretextual stops than White drivers.[13] That study relied on data from the State of Washington, which, for just over a decade, outlawed pretextual traffic stops.[14] Researchers compared the racial distribution of traffic stops when pretextual stops were illegal to the distribution after pretextual stops were legalized.[15] The researchers found that

---

[10] Emma Pierson et al., *A large-scale analysis of racial disparities in police stops across the United States*, 4 Nature Hum. Behav. 736, 737 (July 2020). The study analyzed data from nearly 100 million traffic stops conducted by 21 state patrol agencies and 35 municipal police departments. *Id.*

[11] *Id.*

[12] *Id.* at 737–38.

[13] Rushin & Edwards, *supra*, at 637–38.

[14] *Compare State v. Ladson*, 979 P.2d 833, 839 (Wash. 1999) (en banc) (concluding that Washington's constitution "forbids use of pretext as a justification for a warrantless search or seizure") *with State v. Arreola*, 290 P.3d 983, 991 (Wash. 2012) (en banc) (permitting "mixed-motive traffic stop[s]").

[15] Rushin & Edwards, *supra*, at 683–85.

drivers of color were stopped more frequently after pretextual stops were legalized, even when controlling for other factors such as driver age, officer race, officer gender, and location-specific characteristics.[16] That study also found that stops of drivers of color increased most during daylight hours—again, when a driver's race can be readily perceived.[17]

Another study found that police require less suspicion to search drivers of color than they require to search White drivers.[18] The study analyzed how frequently searches of drivers of color versus White drivers yielded contraband and used statistical modeling to determine the probability of success an officer would need to perceive before deciding to initiate a search of either type of driver.[19] The study found that police typically searched drivers of color with less suspicion than they relied upon to justify searching White drivers.[20] For example, municipal police officers in the study were typically willing to search Black and Hispanic drivers when they expected only a 5% or 4.6% likelihood of success, respectively. By contrast, police in the study typically refrained from searching White drivers unless there was a 10% likelihood of success.[21]

I am not the first to raise concerns about the ways in which police discretion during traffic stops disparately impacts racial and ethnic minorities. Justice Stevens raised the same concern nearly half a century ago in his dissent to the Supreme Court's decision in *Pennsylvania v. Mimms*—the first case to

---

[16] *Id.* at 686–87.

[17] *Id.* at 692–93.

[18] Pierson et al., *supra*, at 737.

[19] *Id.* at 736.

[20] *Id.*

[21] *Id.*

permit police to burden drivers' Fourth Amendment rights absent reasonable suspicion.[22] There, the Supreme Court granted police officers unbridled discretion to order drivers out of their cars during traffic stops in the name of officer safety.[23]

In his dissent, Justice Stevens forecasted that "[s]ome citizens [would] be subjected to this minor indignity while others—perhaps those with more expensive cars, or different bumper stickers, or different-colored skin—may escape it entirely."[24] Time and subsequent research have proven Justice Stevens correct.

**B.**

Since our traffic stop jurisprudence produces racially disparate impacts, two aspects of it particularly warrant further refinement in an appropriate case.

First, in discussing the dangers of traffic stops, our precedents have not differentiated the risks associated with different types of stops.[25] Instead, we have treated stops as though they are homogenous. We have relied on data that group together stops following hot pursuits of suspects who are known to be dangerous with stops following innocuous, technical traffic code violations.[26] By failing to differentiate the risks associated with different types of traffic stops, our jurisprudence often overstates the risks involved in *routine* traffic stops in which there is no reasonable suspicion of

---

[22] 434 U.S. at 113–14 (Marshall, J., dissenting); *id.* at 115–16 (Stevens, J., dissenting).

[23] *Id.* at 111 (per curiam).

[24] *Id.* at 122 (Stevens, J., dissenting).

[25] *Mimms*, 434 U.S. at 110; *Wilson*, 519 U.S. at 413.

[26] Jordan B. Woods, *Policing, Danger Narratives, and Routine Traffic Stops*, 177 MICH. L. REV. 635, 648–49 (2019) (discussing the data source relied upon in *Mimms* and *Wilson*).

danger. We have then relied on this overstated risk to justify giving police unbridled discretion to pursue practices that would typically require reasonable suspicion outside the traffic stop context.

One recent study illustrates the problem. That study concluded that the risk to officer safety associated with routine traffic stops is substantially smaller than the risk associated with other types of police activity.[27] And of the assaults on police that occur during traffic stops, the study found that fewer than 4% occur during traffic stops in which the officer had no reason to suspect danger.[28] Overall, even under the most conservative assumptions, the study found that routine traffic stops result in serious injury to an officer in one in every 325,000 encounters, and in death in one of every 5.42 million encounters.[29] While officer safety is undoubtedly an important consideration in every encounter, these statistics put the risks officers face during routine traffic stops into perspective.

Second, the jurisprudence surrounding traffic stops has focused on the safety of the officer(s) involved. This is perhaps understandable given the nature of police work. However, traffic stops involve more than police; they involve ordinary members of the public as well. Yet, Fourth Amendment jurisprudence surrounding traffic stops has historically ignored the safety of a *vehicle's occupants*.

It is an unfortunate but undeniable reality that traffic stops endanger the occupants of vehicles. An investigation

---

[27] *Id.* at 649–54. In this study, the researcher reviewed more than 4000 narratives of assaults experienced by police to determine the specific circumstances in which each assault occurred. *Id.* at 661–62, 669.

[28] *Id.* at 689.

[29] *Id.* at 682.

conducted by the New York Times found that between 2016 and 2021 police killed "more than 400 drivers or passengers who were not wielding a gun or a knife, or under pursuit for a violent crime—a rate of more than one a week."[30] Indeed, even law enforcement professionals have recognized the danger civilians face in their interactions with police. As the District Attorney for Salt Lake County, Utah, put it, some incidents "get into what I would call anticipatory killings . . . . We can't give carte blanche to that."[31]

This danger is even more pronounced for racial and ethnic minorities, who are not only subjected to police interaction with greater frequency, as discussed above, but are also more likely to be perceived as dangerous and therefore more likely to be subjected to force.[32] A national study of police-involved shootings between 2011 and 2014 found that unarmed Black people were 3.49 times more likely to be killed

---

[30] David D. Kirkpatrick et al., *Why Many Police Traffic Stops Turn Deadly*, N.Y. TIMES, (Oct. 31, 2021), https://www.nytimes.com/2021/10/31/us/police-traffic-stops-killings.html.

[31] *Id.*

[32] Justin D. Levinson et. al., *Deadly "Toxins": A National Empirical Study of Racial Bias and Future Dangerousness Determinations*, 56 GA. L. REV. 225, 281 (2021) (conducting implicit association tests of jury-eligible participants and finding that participants strongly associated pictures of Black and Latino people with danger and pictures of White people with safety); *see also* Cynthia Lee, *Race, Policing, and Lethal Force: Remedying Shooter Bias with Martial Arts Training*, 79 LAW & CONTEMP. PROBS. 145, 149–50 (2016).

by police than unarmed White people.[33] Allowing police too much latitude during a routine traffic stop only increases the risk of the encounter morphing into a tragedy.[34]

---

[33] Cody T. Ross, *A Multi-Level Bayesian Analysis of Racial Bias in Police Shootings at the County-Level in the United States, 2011-2014*, PLoS ONE, Nov. 5, 2015, at 6. This study analyzed the likelihood that an individual would be Black, unarmed and shot by police on a county-by-county basis. *Id.* Black people were 3.49 times more likely to be killed while unarmed in the median county. In some counties, however, the ratio was far worse. *Id.* In some counties, Black people were *20 times* more likely to be shot by police while unarmed. *Id.* at 1.

[34] The New York Times's report on police killings of unarmed drivers and passengers captures how traffic stops can needlessly escalate into tragedies:

> "Open the door now, you are going to get shot!" an officer in Rock Falls, Ill., shouted at Nathaniel Edwards after a car chase.
>
> "Hands out the window now or you will be shot!" yelled a patrolman in Bakersfield, Calif., as Marvin Urbina wrestled with inflated airbags after a pursuit ended in a crash.
>
> "I am going to shoot you—what part of that don't you understand?" threatened an officer in Little Rock, Ark., adding a profanity, as she tried to pry James Hartsfield from his car.

## II.

We are, of course, bound by *Rodriguez*. *Rodriguez* suggests that a criminal record check is a permissible safety precaution that comports with the mission of a traffic stop when conducted in a manner that is negligibly burdensome. I am therefore constrained to join my colleagues' opinion. However, in joining that decision, it is important to note that neither *Rodriguez* nor the court of appeals case it relies upon to sweep record checks into the mission of a traffic stop explain how a criminal record check improves officer safety, and there is reason to doubt that it does.

As my colleagues and I have explained, *Rodriguez* instructs that a traffic stop may not be extended beyond the time necessary to complete the stop's mission.[35] A stop's mission includes "address[ing] the traffic violation that warranted the stop" and "attend[ing] to related safety concerns."[36] These safety concerns include not only concern for the safety of the roadways but also concern for the safety of the officer(s) making the stop.[37]

In discussing how police officers may attend to the safety of the roadways, *Rodriguez* specifies that an officer may

---

The police officers who issued those warnings had stopped the motorists for common offenses: swerving across double yellow lines, speeding recklessly, carrying an open beer bottle. None of the men were armed. Yet within moments of pulling them over, officers fatally shot all three.

*Kirkpatrick* et al., *supra*.

[35] *Rodriguez*, 575 U.S. at 354.
[36] *Id.*
[37] *Id.* at 355–56.

pursue "ordinary inquiries incident to the traffic stop," such as checking a driver's license, insurance, and registration and checking whether there are outstanding warrants for the driver's arrest.[38] The Court considered these inquiries to be consistent with the mission of the traffic stop because "[t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly."[39]

It is clearly important to ensure that drivers can safely and competently operate their vehicles, and it is therefore obvious that the information officers may obtain through their routine traffic stop inquiries serves that objective. For example, a driver's license proves a person is qualified to get behind the wheel. Vehicle registration, which typically requires an annual inspection, helps ensure that a vehicle is safe. Insurance documentation ensures that a driver can compensate others for personal injury or property damage in the event of an accident. And an outstanding warrants check can help an officer determine whether a driver may be wanted for previous traffic offenses[40] or may be tempted to use the roadways to flee in a dangerous manner.

In discussing how police officers may attend to their own safety, however, *Rodriguez* provides little detail. As mentioned above, the Supreme Court stated only that an officer may pursue "certain negligibly burdensome precautions" and did so relying upon a Tenth Circuit decision, *United States v. Holt*,[41] which the Supreme Court parenthetically described as

---

[38] *Id.* at 355.

[39] *Id*. at 354.

[40] *Id.* at 355 (*quoting* W. LaFave, *Search and Seizure* § 9.3(c), 516 (5th 3d. 2012)).

[41] 264 F.3d 1215 (10th Cir. 2001) (en banc).

"recognizing [an] officer safety justification for criminal record and outstanding warrant checks."[42] After making this statement, however, the Court went on to distinguish officer safety and the specific mission of a traffic stop from the general mission of investigating crimes without explaining the connection between criminal record checks and officer safety.

It is not at all clear how a criminal record check advances officer safety. And *Holt*—the only case cited in *Rodriguez* for this point—does not explain the connection. Rather, *Holt* simply assumes a connection, stating only, "[b]y determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better apprized of whether the detained motorist might engage in violent activity during the stop."[43]

But, the relationship between an individual's criminal record and likelihood of assaulting a police officer is extremely tenuous. "Numerous . . . studies have shown that recidivism occurs relatively quickly,"[44] and at least one study has shown that individuals with prior records are no more likely to reoffend than members of the general public after those

---

[42] *Rodriguez*, 575 U.S. at 356. Curiously, the Court cited to *Holt* with a "cf." signal, which means "compare" and is used when the "[c]ited authority supports a proposition different from the main proposition but sufficiently analogous to lend support." *The Bluebook: A Uniform System of Citation*, R.1, at 59 (Columbia L. Rev. Ass'n et al. eds., 20th ed. 2015). The Court's use of this signal further obfuscates the Court's discussion of officer safety precautions.

[43] 264 F.3d at 1222–23.

[44] Alfred Blumstein & Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks*, 47 CRIMINOLOGY 327, 323, 331 (2009).

individuals have remained free from encounters with the criminal legal system for a period of time.[45] Thus, the older the crime, the less likely it is to have any relevance to an individual's propensity towards violence during the traffic stop. The predictive value of a criminal record also depends on the nature of the prior crime(s) as well as an individual's current age and age when first arrested.[46] Thus, the academic literature on recidivism suggests only a limited subset of past crimes would have potential relevance to an officer's safety, and then only for a limited subset of drivers.

Yet, I seriously doubt that officers have the kind of training that would allow them to meaningfully assess the significance of the information obtained through a "routine" criminal record check, even if the record check provided the kind of detail that would allow for such an assessment. And that kind of analysis would, of course, further delay the detained motorist and passengers.

Moreover, conducting criminal record checks during traffic stops could very well endanger officers as well as the occupants of the stopped vehicle rather than making officers safer. As I have just explained, prior encounters with the criminal justice system may have little or no bearing on a driver's present dangerousness. But, after reviewing a driver's criminal record, an officer might assume the driver is dangerous or otherwise engaged in criminal activity. The officer would therefore return to the stopped vehicle with heightened apprehension. That only multiplies the opportunities for misunderstanding, misinterpretation, and escalation, thus creating a situation where both the officer and the vehicle's occupant(s) are at increased risk. It certainly

---

[45] *Id*. at 333.

[46] *Id.* at 331, 333, 339.

13

increases the likelihood that the occupants would be ordered out of the vehicle, and this, in turn, may well increase the likelihood of confrontation.[47]

## III.

Traffic stops are very fluid and dynamic encounters between police and ordinary members of the public. They are, of course, necessary to ensure that vehicles are operated "safely and responsibly" as the Supreme Court has explained. Fortunately, the vast majority of them are conducted without incident or confrontation.

---

[47] Although there is not unanimity of opinion, some researchers and law enforcement professionals argue that ordering the occupants out of a vehicle endangers officers rather than making them safer. *See* Cal. Comm'n on Peace Officer Standards and Training, *Basic Course Workbook Series Student Materials Learning Domain 22 Vehicle Pullovers* p. 2-3 (v.3.2, 2018) ("It is generally desirable for patrol officers to have the driver and occupants of the target vehicle remain in the vehicle throughout the duration of the pullover."); Metropolitan Police Academy, *Traffic Stops* § 12.3.4 (2023) (instructing officers in "high-risk" stops to "instruct all passengers to remain in the vehicle"); Woods, *supra*, at 708 (discussing recent empirical evidence indicating that ordering drivers and passengers out of a car increases the officer's risk of being assaulted); *see also Mimms*, 434 U.S. at 119 (Stevens, J., dissenting) (noting that experts on traffic stops "strongly recommend that the police officer 'never allow the violator to get out of the car'" (citing Vern L. Folley, POLICE PATROL TECHNIQUES AND TACTICS 95 (1973); August M. Yount, VEHICLE STOPS MANUAL: MISDEMEANOR AND FELONY 2–3 (1976); George T. Payton, PATROL PROCEDURE 301 (4th ed. 1971))).

But as I have explained, studies have shown that the discretion underlying an officer's decision to stop a motorist is often influenced by factors that would raise constitutional concerns but for the Fourth Amendment latitude courts have historically allowed in the traffic stop context. As I have also explained, studies have now validated Justice Stevens' concern that the decision to stop a motorist is sometimes influenced by the color of that motorist's skin. Although there does not currently appear to be a remedy for such discrimination, I am hopeful that our Fourth Amendment jurisprudence will yet evolve to ensure that all motorists receive the same degree of protection from an officer's conscious or unconscious bias.

My colleagues conclude that the District Court erred in granting Hunter's suppression motion here. Because that result is consistent with, and required by, the Supreme Court's analysis in *Rodriguez*, I join my colleagues' opinion despite the concerns I have expressed.