PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2739
_____

UNITED STATES OF AMERICA,
                                        Appellant
                    v.

THEODORE L. CLARK, III


_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 3-16-cr-00449-001)
District Judge: Honorable Freda L. Wolfson
_____

Argued June 4, 2018

Before: AMBRO, JORDAN, and VANASKIE, <u>Circuit Judges</u>

(Opinion filed: August 30, 2018)

Craig Carpenito
    United States Attorney
William E. Fitzpatrick
  Acting United States Attorney

Mark E. Coyne, Esquire
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ  07102-2535

Norman Gross                (Argued)
   Assistant United States Attorney
401 Market Street
Camden, NJ   08101

          Counsel for Appellant

Lisa Van Hoeck, Esquire    (Argued)
Office of Federal Public Defender
22 South Clinton Avenue
Station Plaza #4, 4th Floor
Trenton, NJ  08609

          Counsel for Appellee

————————————

OPINION OF  THE  COURT

————————————

AMBRO, Circuit Judge

Edison, New Jersey, Police Officer Daniel Bradley and his partner saw a minivan on the road at night without headlights, while its driver was using a mobile phone and had an obstructed view. They pulled over the van, driven by Donald Roberts, in which Appellee Theodore "Tyrone" Clark III was a passenger. The traffic stop lasted about 23 minutes from the time Officer Bradley arrived at the driver-side

2

window until he discovered a handgun and a marijuana cigarette on Clark.

If the traffic stop was impermissibly extended to reach that point, however, any evidence seized after the stop should have ended may be suppressed per *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). The District Court decided that is the case here and the Government appeals, seeking admission of the handgun into evidence to support Clark's indictment for unlawful possession of it. We agree with the Court that Bradley impermissibly extended the traffic stop after its mission was completed, and thus we affirm its grant of Clark's motion to suppress.

## I.    Facts

We derive the facts relevant to the traffic stop from a forensically enhanced audiovisual recording of it and the District Court's undisputed factual findings.

The traffic stop here began routinely. Bradley asked to see Roberts' license, registration, and proof of insurance. Roberts handed over the first two items, but he could not find the vehicle's registration. Dashboard Camera Video ("DCV") 00:10:32–00:11:05. Bradley waited while Roberts searched for the registration. He said the vehicle belonged to his mother and offered to call her to ask the location of the registration. DCV 00:11:06–48. Bradley stated the stop was for three traffic violations and asked whether Roberts' license was suspended; the response was no. Bradley inquired if the vehicle belonged to Roberts' mother, and Roberts affirmed that it did. DCV 00:11:49–00:12:21. Bradley then went back to his patrol car with Roberts' license and proof of insurance to run a computerized check of the vehicle's registration based on the license plate number. DCV 00:12:22–30. His check revealed the license was valid, Roberts had a criminal

3

record for drug offenses, there were no outstanding warrants for his arrest, and the vehicle was registered to Kathy L. Roberts at the same New Brunswick address listed on Donald Roberts' driver's license. *United States v. Clark*, No. 16-449, 2017 WL 3394326, at *1–2 (D.N.J. Aug. 7, 2017).

Bradley returned to the driver-side window and immediately asked Roberts about his criminal record, specifically, whether he had been arrested, for what kinds of crimes, and the date of his last arrest. He answered that he had been arrested for drug crimes, most recently in 2006. DCV 00:16:49–00:17:12.

Bradley then asked Roberts about his earlier whereabouts. He replied he was coming from his mother's house. Bradley followed up by asking whether his mother's house was in New Brunswick. Roberts did not answer, and instead said into his phone, on speakerphone, "Mom, you [sic] on a three-way." Bradley asked again, and Roberts said into his phone, "He's asking me questions about . . . what have I ever been arrested for, where have I ever been at, and I'm sitting here telling you that—I'm using you as confirmation—I just came from the QuickCheck and before the QuickCheck I was in . . . Plainfield." DCV 00:17:13–42. Bradley asked a third time and Roberts responded that *his* address was in New Brunswick. Bradley then questioned if the vehicle belonged to his wife, and Roberts responded it belonged to his mother, his mother was the person on the phone, and she lived in Plainfield. Bradley noted that the vehicle was registered in New Brunswick, and the female voice on Roberts' phone stated she did not change her address on the registration. DCV 00:17:43–00:18:06.

Roberts said the questions were confusing him and Bradley replied that he too was confused. He explained he asked the criminal history questions because, "[r]elevant to

4

being arrested, I'm trying to figure out where you were coming from. And I pulled up your history to see if you were lying to me." He repeated the motor vehicle offenses he observed and said, "I'm trying to figure out where you're coming from, that's why I'm asking you these questions. I know your driver's license and I know your history. That's why I asked you—to confirm if you're lying." DCV 00:18:07–00:19:24. Bradley then inquired if Roberts had any outstanding warrants for arrest or parking tickets, and Roberts explained he had just been released from prison and had no such issues. DCV 00:19:25–57. Bradley then queried how many times Roberts had been arrested. He answered, "What is that for?" whereupon Bradley asked him to step out of the vehicle. DCV 00:19:57–00:20:08. The two walked to the rear of the vehicle, and then Bradley again explained, "I'm asking you questions, most of them, I already know the answer to. . . . I told you why I stopped you, I ran your driver's license, I ran for warrants, very simple, okay, that's it." DCV 00:20:09–36.

The conversation suddenly switched to a series of questions about Clark, including his name, how long they had known one another, and how they came to travel together. Roberts stated Clark's name was Tyrone, he did not know his last name, they had not been friends for long, and he picked him up earlier that night in the Potters community in Edison Township. DCV 00:20:37–00:21:43.

Bradley approached the passenger's side to question Clark, leaving Roberts by the rear of the vehicle watched by the other officer. He asked Clark the same questions he had just put to Roberts, to which Clark responded with his full name, that he had known Roberts for a long time, they were coming from Roberts' mother's house, and he stayed over at Roberts' house in New Brunswick the previous night. DCV 00:21:44–00:24:58.

5

Bradley returned to Roberts, telling him that he and Clark gave a conflicting account, and questioned why he lied. Roberts denied lying and attempted to explain the route itinerary. Bradley said he smelled a strong odor of marijuana from the passenger's side, but he did not smell anything from the driver's side. DCV 00:24:59–00:28:50. He then asked Clark to get out of the vehicle because he intended to search it. The two officers told Clark to turn around for a pat-down. Clark complied and told them he had a handgun in his waistband. They removed a 0.357 caliber Smith and Wesson revolver, loaded with six rounds of ammunition, and a marijuana cigarette from Clark's person. DCV 00:28:51–00:34:00.

Clark was then taken into custody and Roberts was permitted to leave after the officers issued him a summons for the motor vehicle violations. *Clark*, 2017 WL 3394326, at *3. He did not receive any summons relating to the vehicle's registration. *Id.*

## II.    Procedural History

A federal grand jury indicted Clark for possession of a weapon as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[1] He moved to suppress the handgun seized from him during the traffic stop on the ground that the officers impermissibly prolonged the stop and any evidence recovered thereafter should be suppressed as fruit of the poisonous tree under the Fourth Amendment to the United States Constitution.

---

[1] State authorities also charged Clark with violating New Jersey law based on the same incident. He received a notice of parole violation, was remanded to East Jersey State Prison, and then had his parole revoked.

6

The District Court heard oral argument on the effect of *Rodriguez* on Clark's claim. The Court noted that Clark conceded Bradley had reasonable suspicion to make the traffic stop, and the parties did not dispute that he developed a reasonable suspicion to continue to question Roberts and Clark at *some point* during the stop. Rather, they contested when the suspicion arose and whether the stop had been unconstitutionally prolonged to reach that point. No live testimony was given; the only evidence presented was the recording of the stop and motor vehicle records.

The District Court granted Clark's motion. *Id.* at *10. Its analysis focused on two issues: Was the criminal history questioning of Roberts within the scope of "ordinary inquiries" incident to a traffic stop (its purpose, referred to by *Rodriguez* as its "mission," is "to address the traffic violation that warranted the stop and attend to related safety concerns," 135 S. Ct. at 1614 (citation omitted)), and did Bradley have reasonable suspicion during the stop to investigate other criminal matters?

As to the former, the Court found that the computerized check of Roberts' license, insurance, outstanding warrants, and criminal record, and of the validity of the vehicle's registration and Roberts' authority to drive, were permissible "ordinary inquiries," as were the later questions about travel plans and route. *Clark*, 2017 WL 3394326, at *7. The intervening questions about Roberts' criminal history, however, were not. *Id.* Bradley already knew that information, and so the criminal history questions were not aimed at ascertaining it. *Id.* Nor did the Government suggest any connection between those questions and Roberts' motor vehicle violations, road and traffic safety, or officer safety. *Id.* Rather, the Court decided that, after Bradley ran the computerized check, "there were no outstanding questions related to the traffic stop itself meriting further inquiry, and

7

the only step remaining to complete the stop was for Officer Bradley either to issue [a] summons for the motor vehicle violations or allow Roberts to leave with a warning." *Id.*

Turning to the latter question, the Court found Bradley did not acquire reasonable suspicion during the stop's mission sufficient to prolong it, as his computerized check confirmed Roberts' answers to his earlier questions. *Id.* at *9. Further, the Government did not contend, and the recording did not support, that Roberts' behavior was suspicious or inappropriate. *Id.* Hence Bradley could not have formed a reasonable suspicion that justified investigation into other criminal activity. *Id.*

The Government appeals the grant of Clark's motion to suppress. It argues the Court committed legal error only as to the first inquiry: whether the criminal history questions were "off-mission." It does not appeal the second part of the Court's decision—that Bradley lacked reasonable suspicion to continue questioning after the computerized records check.

## III.  Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 18 U.S.C. § 3731. We review *de novo* legal arguments challenging a suppression ruling, and we review factual findings for clear error. *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (citation omitted). Mixed questions of law and fact are subject to independent appellate review. *Ornelas v. United States*, 517 U.S. 690, 696–97 (1996).

The Government bears the burden of showing (and presenting evidence) that the traffic stop was reasonable. *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013); *United States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002);

8

*United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). We view the evidence presented in the light most favorable to the District Court's ruling, *United States v. Cook*, 277 F.3d 82, 84 (1st Cir. 2002), and draw reasonable inferences in Clark's favor, *id.*

## IV.    Discussion

A traffic stop, even if brief and for a limited purpose, "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Though a stop may be lawful at its inception (as the parties agree is the case here), it could become "unreasonable," and thus violate the Constitution's proscription, at some later time. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). We review objectively the officer's rationale, by looking to the facts and circumstances confronting him or her, to determine whether his or her actions during the stop were reasonable. *United States v. Delfin-Colina*, 464 F.3d 392, 397–98 (3d Cir. 2006).

The Supreme Court in *Rodriguez* directs our attention to the mission of the traffic stop to determine whether it is impermissibly lengthened.[2] 135 S. Ct. at 1614–16. A stop

---

[2] Though not relevant to the case before us, the Court also acknowledged its prior decisions that concluded "the Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention." *Rodriguez*, 135 S. Ct. at 1614 (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the . . . traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.").

9

becomes unlawful when it "last[s] . . . longer than is necessary" to complete its mission, the rationale being that the "[a]uthority for the seizure . . . ends when tasks tied to the [mission] are[,] or reasonably should have been[,] completed."[3] *Id.* at 1614. To prolong a stop beyond that point, the officer must have acquired reasonable suspicion during the mission to justify further investigation. *Id.* at 1615. There is no *de minimis* exception to this rule.[4] *Id.* at 1616.

---

In *United States v. Green*, 897 F.3d 173 (3d Cir. 2018), we noted in *dicta* the difficulty inherent in deciding when a traffic stop is "measurably extended." *Id.* at 180. In that case, we ultimately assumed an officer's traffic-stop mission ended after his initial conversation with the driver because after that point his actions were geared to rooting out a drug offense unrelated to the motor vehicle violation. *Id.* at 182. Though we too note our concern, that ambiguity is not at issue here because the Government does not contest that the criminal history questions prolonged the stop—it argues only that the questions were in fact related to the stop's mission. *See generally* Appellant's Br. at 13–28.

[3] The Court elaborated that "[t]he critical question . . . is not whether the [inquiry] occurs before or after the officer issues a ticket, . . . but whether [it] prolongs . . . the stop." *Rodriguez*, 135 S. Ct. at 1616 (quotation marks omitted). Thus the Government's claim that the stop was not yet over because no tickets had been issued falls short.

[4] The Government's argument that the brevity (20 seconds) of the criminal history questioning does not support it being off-mission also fails given the Supreme Court's explicit rejection of a *de minimis* exception in *Rodriguez*. 135 S. Ct. at 1616. We note, however, this does not compel officers to

To repeat, a traffic stop's mission is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* at 1614 (citation omitted). "Beyond determining whether to issue a traffic ticket," this includes "ordinary inquiries incident to [the traffic] stop." *Id.* at 1615 (citation omitted) (alteration in original). These incidental inquiries typically involve checking the driver's license and any outstanding warrants against the driver, as well as inspecting the vehicle's registration and insurance. *Id.* They are considered part of the traffic stop's mission because they serve its ultimate objective—to ensure roadway safety. *Id.* Tasks tied to officer safety are also part of the stop's mission when done out of an interest to protect officers. *Id.* at 1616.

Not all inquiries during a traffic stop qualify as ordinarily incident to the stop's mission. In particular, those "measure[s] aimed at detect[ing] evidence of ordinary criminal wrongdoing" do not pass muster. *Id.* at 1615 (quotation mark omitted) (second alteration in original). "On-scene investigation into other crimes . . . detours from th[e] mission," as do "safety precautions taken . . . to facilitate such detours." *Id.* at 1616. This is because "the Government's endeavor to detect crime in general or drug trafficking in particular" is different in kind than roadway and officer safety interests. *Id.*

Thus, considering objectively the circumstances and facts coloring the interaction, we must determine whether Bradley's criminal history questioning, ostensibly aimed at

---

move with the utmost expedience; the relative length or brevity of an inquiry does not bear on whether it was on- or off-mission. *Id.*

11

verifying Roberts' authority to drive,[5] was tied to the traffic stop's mission, or instead whether the traffic stop must reasonably be seen as having been completed before that questioning began. Though Roberts was unable to find the vehicle's registration, he told Bradley that the vehicle belonged to his mother and he offered to call her to help locate the registration. Bradley nonetheless asked Roberts whether the vehicle belonged to his mother, which he affirmed. Because Roberts was still unable to locate the registration card, Bradley ran a computerized check of the license plate to obtain that information. The information he obtained confirmed Roberts' assertion—the vehicle was registered to a woman sharing his surname and residing at the same address listed on his driver's license. The Government does not contend, and the recording does not support, that anything about Roberts' behavior until that point fostered uncertainty about his authority to drive the vehicle. Though we can surely imagine other circumstances in which testing a driver's candor about his authority to operate a vehicle—even by asking questions confirming his criminal history—would be a reasonable part of a traffic stop, that is not the case here.

We agree with the District Court that, given the information confronting Bradley when he confirmed through the computerized check that Roberts was authorized to drive the vehicle, and when there was no fact calling that authority into doubt, Bradley no longer could have reasonably questioned it. Bradley's inquiry into Roberts' criminal history

---

[5] We do not decide whether Bradley's actual motivation for asking Roberts about his criminal history was to determine his authority to drive. Even so, we note that, contrary to the Government's suggestion, Appellant's Br. at 11, 16, 23, the recording reveals that the officer did not explain to Roberts that he asked the questions for that purpose.

12

was thus not tied to the traffic stop's mission, and, at that point, "tasks tied to the traffic infraction . . . reasonably should have been . . . completed." *Id.* at 1614. The questions therefore impermissibly extended the stop.

Contrary to the Government's suggestion, our holding does not "imagine some alternative means by which the objectives of the police might have been accomplished," *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985), nor do we "require that the officer employ the least intrusive means conceivable in effectuating [the] traffic stop," *United States v. Hill*, 852 F.3d 377, 383 (4th Cir. 2017) (quotation marks omitted) (emphasis omitted). Simply stated, we hold that, after Bradley's computerized check confirmed Roberts' authority to drive the vehicle and without any other indicia he lacked that authority, the traffic stop was effectively completed.[6] To then turn to the passenger—Clark—for questioning that sought suspicion for criminal activity went beyond "ordinary inquiries incident to [the traffic] stop." *Rodriguez*, 135 S. Ct. at 1615 (citation omitted) (alteration in original).

Thus we affirm the District Court's grant of Clark's motion to suppress the handgun seized from him after the traffic-stop's mission concluded.

---

[6] We do not reach the Government's claim that the criminal history questions' redundancy with the information obtained from the computerized check did not render them "off-mission." The District Court did not state their redundancy did so; rather, it stated they were redundant to explain their purpose was not to acquire criminal history information. *Clark*, 2017 WL 3394326, at *7. The Government does not contest this finding.

13