**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-3014
_____

UNITED STATES OF AMERICA

v.

GILROY ST. PATRICK STEWART,
Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-18-cr-00310-001)
District Judge: Honorable Robert D. Mariani
_____

Argued on September 6, 2023

Before: CHAGARES, *Chief Judge*, HARDIMAN, and
FREEMAN, *Circuit Judges*.

(Filed: February 2, 2024)

Randy S. Zelin [Argued]
641 Lexington Avenue, 29th Floor

New York, NY 10022

     *Counsel for Appellant*

Gerard M. Karam
Christian T. Haugsby [Argued]
United States Attorney's Office
Middle District of Pennsylvania
228 Walnut Street, Suite 220
Harrisburg, PA 17101

     *Counsel for Appellee*

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

This dispute arises under the Fourth Amendment and requires us to apply *Rodriguez v. United States*, 575 U.S. 348 (2015). Gilroy St. Patrick Stewart appeals the District Court's order denying his motion to suppress evidence from a traffic stop. Stewart argues that the officer unconstitutionally prolonged the traffic stop. We disagree. The officer had reasonable suspicion of criminal activity when he extended the length of the stop. We will therefore affirm.

I

Around 6:30 p.m. on August 28, 2018, Trooper George Tessitore was monitoring westbound traffic on Interstate 80 in

Carbon County, Pennsylvania, when he noticed a minivan driving more slowly than the cars around it. The vehicle had heavily tinted windows and a partially obstructed license plate—both violations of the Pennsylvania Vehicle Code, 75 Pa. Cons. Stat. Ann. §§ 4524(e)(1), 1332(b)(3). Tessitore pulled the car over.

Tessitore approached the vehicle and asked the driver—Appellant Gilroy Stewart—for his driver's license and the vehicle's registration. Stewart produced an Ohio driver's license with a Cleveland address, though the vehicle was registered to a Hazel Sparkes of Baldwin, New York. Tessitore asked Stewart if the vehicle was his, and Stewart answered that it belonged to his aunt. Tessitore then explained the reasons for the stop: the dark window tint and the partially obstructed license plate, both of which violated state traffic laws. Tessitore also noticed an air freshener hanging from Stewart's rear-view mirror.

Tessitore inquired if Stewart was driving back to Cleveland, and Stewart said he was. Tessitore then asked about the address on the vehicle registration: "Where's Baldwin at? I've heard of it. I can't place it on a map, though." Mobile Video Recorder (MVR) 2:19–22. Laughing, Stewart replied without answering the question: "You know where Baldwin is." MVR 2:23–27. Tessitore countered that he did not know where Baldwin was. In response to other questions, Stewart explained that he was traveling back from New York—where he had dropped his daughter off at school—and was using the vehicle temporarily. Tessitore then returned to his police car to input information into the system and to run a search on Stewart's criminal history.

A few minutes later, Stewart exited his vehicle, and

3

Tessitore told him he wasn't supposed to do that. Tessitore then had Stewart stand on the side of the road next to his police car, away from traffic. While Stewart stood there, Tessitore asked why Stewart, who lived in Cleveland, borrowed the New York-registered vehicle for his trip to New York. Stewart replied: "My aunt, she lives in Cleveland, too. She has that car. I took my daughter to New York and . . . I'm bringing the car back." MVR 8:29–40. When Tessitore sought to confirm that Stewart's aunt lived in Cleveland, Stewart answered, "Yeah, she goes back and forth—she has a nursing home." MVR 8:47–51. On further questioning, Stewart explained that his aunt *owned* a nursing home. That prompted Tessitore to ask whether the nursing home was in New York or Cleveland. Stewart responded: "In Cleveland. It's so hard to own anything in New York!" MVR 8:58–9:02.

Tessitore then inquired about Stewart's time in New York, asking where Stewart had stayed while his daughter was at college. Stewart replied: "She stays at the university. She's on a track scholarship." MVR 9:33–37. Tessitore reiterated the question: "Yeah, that's where she stays. Where'd you stay out in New York?" MVR 9:37–40. Stewart answered: "I have family in New York." MVR 9:40–42.

At this point during the traffic stop, Tessitore stopped asking questions for a few minutes as he sent and received information on the police car system. When he started questioning Stewart again, Tessitore asked about Stewart's and his aunt's addresses. Tessitore continued entering information in relative silence until eventually telling Stewart: "I'll write you up a warning then, okay?" MVR 15:28–15:30.

Soon afterward, Tessitore called for backup while continuing to talk to Stewart. Fifteen minutes later, Tessitore

4

handed Stewart his written warning. Tessitore then asked for permission to search Stewart's vehicle, but Stewart refused. Tessitore explained that Stewart would have to wait for a narcotics canine to arrive. Around an hour and 15 minutes into the stop, Corporal Anthony Doblovasky arrived with his drug-detection dog. As Doblovasky led the dog around the vehicle, he told Stewart that the dog "likes your car a lot." 1:24:14–16. Upon searching the vehicle, Tessitore and Doblovasky discovered 20 kilograms of cocaine in a hidden compartment.

Stewart was charged with possession of five kilograms or more of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A). He moved to suppress the cocaine as the fruit of an unlawful search. The District Court denied Stewart's motion, concluding that Tessitore did not extend the traffic stop in violation of the Fourth Amendment. *See United States v. Stewart*, 2021 WL 2478440, at *12, *18 (M.D. Pa. June 17, 2021). Stewart then entered a conditional guilty plea, which preserved his right to appeal the order denying his suppression motion. *See* Fed. R. Crim. P. 11(a)(2). The District Court sentenced Stewart to 51 months' imprisonment and 3 years' supervised release. Stewart timely appealed.[1]

## II

We review the District Court's legal determinations de novo and its factual findings for clear error. *United States v. Garner*, 961 F.3d 264, 269 (3d Cir. 2020). Because the District

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Court denied the suppression motion, we view the facts in the light most favorable to the Government. *Id.*

## III

Stewart does not contest the legality of the initial traffic stop—he challenges only the extension of the stop. "[A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket." *Rodriguez*, 575 U.S. at 354–55 (cleaned up). "[A]n officer's mission includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (cleaned up). But under the Supreme Court's decision in *Rodriguez,* an officer may not "prolong[] the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* As we have explained, "[a]n unreasonable extension"—and thus a Fourth Amendment violation—"occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018).

Our inquiry under *Rodriguez* proceeds in two steps. *See United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022). First, we determine the moment when the stop was measurably extended, which we have called the "*Rodriguez* moment." *Green*, 897 F.3d at 179. Second, we determine whether the facts available to the officer up to that moment established reasonable suspicion of criminal activity. *Id.* The extension of the traffic stop is lawful only if, at the time of the extension, the officer already had reasonable suspicion. *See Garner*, 961 F.3d at 271.

A

We first consider when Trooper Tessitore extended the stop. In the brief supporting his suppression motion and in his opening brief here, Stewart discussed three possible moments when Tessitore might have done so. Stewart's earliest proposed *Rodriguez* moment comes 15 minutes and 30 seconds into the video, when Tessitore tells Stewart that he will issue him a warning.

The District Court assumed that this was the correct *Rodriguez* moment. *See Stewart*, 2021 WL 2478440, at \*8. And the Government conceded that "it's fair to peg" the *Rodriguez* moment to around the 15-minute mark, when Tessitore said he would issue Stewart a warning. Oral Arg. 20:12–13. Our review of the video record leads us likewise to conclude that, at least until that time, Tessitore remained on-mission for the traffic stop. Tessitore was completing tasks related to Stewart's traffic violation, and his questions—which focused on Stewart's travel plans—were within the scope of the traffic stop. *See Garner*, 961 F.3d at 271. We therefore assume, without deciding, that the stop was extended at the 15-minute-30-second mark. *See Green*, 897 F.3d at 179.

B

We turn now to whether Trooper Tessitore had reasonable suspicion by the time the "*Rodriguez* moment" occurred. To do so, "we consider 'the totality of the circumstances—the whole picture.'" *Garner*, 961 F.3d at 271 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Although this standard "requires more than a 'hunch,'" *id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)), it is

relatively deferential to the detaining officer. We "recognize the particular ability of law enforcement officers, based on training and experience, 'to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Green*, 897 F.3d at 183 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted). Here, for instance, Tessitore had approximately 200 hours of training in criminal interdiction and had made arrests resulting in the seizure of illegal drugs and other contraband.

Moreover, an officer's "reasonable suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis." *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62 (2018)). In other words, even if a criminal defendant provides a "plausible, innocent explanation[]" for "each arguably suspicious factor" on its own, that does not defeat the inference of reasonable suspicion derived from the cumulative effect of available information. *Id.*

At the same time, the reasonable suspicion standard is an objective one. *Arvizu*, 534 U.S. at 273. We consider "whether a reasonable, trained officer standing in the officer's shoes could articulate specific reasons justifying" the extension of the stop. *United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (cleaned up). So context matters. The same behavior exhibited by different drivers "might well be unremarkable in one instance . . . while quite unusual in another." *Arvizu*, 534 U.S. at 276. Our task is to confirm that "the degree of suspicion" that the law enforcement officer assigned the "to particular types of noncriminal acts" objectively, and

8

cumulatively, provided reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 10 (1989) (cleaned up).

In this case, the cumulative weight of six factors leads us to conclude that Tessitore had reasonable suspicion before our assumed *Rodriguez* moment at the 15-minute-30-second mark of the traffic stop video. First, Stewart provided evasive, inconsistent, and downright puzzling answers to Tessitore's questions about his travel. Second, the windows of Stewart's vehicle had a dark tint. Third, Stewart was driving someone else's car. Fourth, Stewart had a history of run-ins with the law, including a money laundering arrest made by the Drug Enforcement Agency. Fifth, Stewart was traveling along a well-known drug smuggling corridor. And finally, Stewart's vehicle had an air freshener. "Having considered the totality of [these] circumstances and given due weight to the factual inferences drawn by the law enforcement officer," as discussed below, "we hold that [Tessitore] had reasonable suspicion to believe that [Stewart] was engaged in illegal activity." *Arvizu*, 534 U.S. at 277.

1

Stewart's evasive and odd answers to Trooper Tessitore's questions contributed to reasonable suspicion. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Tessitore testified that Stewart exhibited signs of nervousness—in particular, that Stewart avoided eye contact. Answers to questions about travel that are "sufficiently confusing" can also "meaningfully contribute to reasonable suspicion." *Green*, 897 F.3d at 185. And "internally inconsistent statements . . . regarding travel plans" can "contribute to an officer's reasonable suspicion of illegal

9

activity." *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011), *quoted in United States v. Benoit*, 730 F.3d 280, 285–86 (3d Cir. 2013). Several of Stewart's comments early in the stop were evasive, inconsistent, or inexplicable.

For instance, on seeing that the vehicle was registered to a Baldwin, New York, address, Tessitore asked Stewart where Baldwin was. Strangely, Stewart replied: "You know where Baldwin is." MVR 2:23–2:28. He never answered the question.

Stewart also had an inconsistent and odd story about his travel plans. According to Stewart, the vehicle—registered to a New York address—belonged to his aunt. But when Tessitore asked how Stewart, a Cleveland resident, had borrowed the vehicle from his New York-based aunt, Stewart answered that his aunt "lives in Cleveland, too." MVR 8:30–32. And when Tessitore pressed the issue, Stewart explained that his aunt "goes back and forth" between New York and Cleveland because "she has a nursing home." MVR 8:47–8:51. On further questioning, Stewart clarified that this meant his aunt "owns a nursing home" in Cleveland rather than New York. MVR 8:53–8:55. "Though not strictly contradictory" or "logically irreconcilable," Stewart's answers about his aunt and her vehicle were "sufficiently confusing" to provoke reasonable suspicion. *Green*, 897 F.3d at 185.

Moreover, Stewart said he had borrowed the vehicle to take his daughter to college in New York and was now bringing it back to Cleveland. Yet Stewart evaded questions about the New York trip. When Tessitore asked where *Stewart* had stayed in New York, he answered that *his daughter* "stays at the university." MVR 9:33–35. This prompted Tessitore to repeat the question, clarifying that he was asking where

10

Stewart had stayed, not where his daughter stays for school. Stewart gave another non-answer: "I have family in New York." MVR 9:40–9:42.

Tessitore testified that Stewart's vague answers about his travel contributed to his suspicion. That was a reasonable inference. *See United States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010) ("[T]he court has found vague, inconsistent or evasive answers with respect to travel plans supportive of reasonable suspicion."); *United States v. Pacheco*, 996 F.3d 508, 512 (8th Cir. 2021) ("We have previously found reasonable suspicion to detain a vehicle's occupants in part because of their vague and confusing answers to routine questions about travel plans."). We therefore hold that Stewart's answers support the District Court's conclusion: Tessitore reasonably suspected that Stewart was engaged in criminal activity.

2

Stewart's darkly tinted windows, the initial cause for the stop, also helped to establish reasonable suspicion. On top of this window tint, the car's sun-screening shades also made it "extremely dark inside the interior of the vehicle." App. 73. Tessitore explained to the District Court that, in his experience, vehicles with darkly tinted windows often contain hidden compartments. Hidden compartments, in turn, often store drugs or other contraband. *See United States v. Zamudio-Carrillo*, 499 F.3d 1206, 1210 (10th Cir. 2007). So the District Court found that tinted windows "are a common indicator of vehicles used to transport contraband." *Stewart*, 2021 WL 2478440, at *9. On the facts here, we agree with the District

11

Court that dark window tinting was a factor contributing to Tessitore's reasonable suspicion.

3

The registration of Stewart's vehicle to a third party was also a factor. From almost the start of the traffic stop, it was clear that Stewart was not the vehicle's owner. When Tessitore asked whether the vehicle belonged to Stewart, he replied that it was his aunt's vehicle. And in response to follow-up questions, Stewart explained that he was using the vehicle temporarily.

As Tessitore testified, traffickers often use vehicles owned by others to transport drugs. For that reason, we have counted the use of a third-party vehicle as a factor contributing to reasonable suspicion. *See United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (rental car). Here "the fact that [Stewart] was driving a car not registered to him," combined with the other factors, could "form the basis for a 'reasonable suspicion' of narcotics trafficking." *United States v. Branch*, 537 F.3d 328, 340 (4th Cir. 2008).

Stewart cites *United States v. Clark*, 902 F.3d 404 (3d Cir. 2018), for the proposition that driving another person's vehicle does not give rise to reasonable suspicion. In *Clark*, the police "impermissibly extended the stop" of a driver whose vehicle was registered to his mother. *Id.* at 411. There, however, the vehicle was registered to the same address listed on Clark's driver's license, confirming that Clark was likely telling the truth about driving his mother's vehicle. *See id. at* 406, 411. Here, by contrast, there was a discrepancy between the state of the vehicle's registration (New York) and the state of Stewart's driver's license (Ohio)—a discrepancy that

12

Stewart never rationally explained. *See* MVR 8:30–32 (claiming that the aunt who owned the New York-registered vehicle "lives in Cleveland, too"). Consistent with our precedent, the District Court correctly concluded that the use of a third-party vehicle was one factor among several others that collectively gave rise to reasonable suspicion. *See Givan*, 320 F.3d at 458–59; *see also Branch*, 537 F.3d at 338–40.

4

Stewart's history of arrests also supported Tessitore's reasonable suspicion that Stewart was engaged in drug trafficking. When Tessitore ran a criminal background check, he learned that Stewart had been arrested in Ohio and Illinois. The Illinois case was a Drug Enforcement Administration arrest for money laundering. Tessitore testified that the DEA arrest contributed to his suspicion that Stewart was engaged in drug trafficking. The District Court found that Tessitore was aware of this DEA arrest before saying he would issue Stewart a warning. *See Stewart*, 2021 WL 2478440, at *11. This finding tracked Tessitore's testimony that he ran the criminal history check on Stewart immediately after running his driver's license through the system.

Although an arrest record "is not sufficient to establish reasonable suspicion, it is a valid factor." *Green*, 897 F.3d at 187. Such a record is relevant particularly, though not exclusively, when a previous arrest "relate[s] to the crime being investigated." *Id.* In *Green*, "prior arrests for drug and firearm violations," together with other factors, established reasonable suspicion that the defendant was engaged in drug trafficking. *Id.* Here, Stewart's multiple prior arrests, and the

13

DEA arrest in particular, contributed to reasonable suspicion of drug trafficking.

5

Stewart's travel on I-80, which Tessitore knew to be a drug trafficking corridor, was also a factor contributing to reasonable suspicion. *See Garner*, 961 F.3d at 272. Within the first three minutes of the video, Tessitore learned that Stewart was taking I-80 from New York City to Cleveland, Ohio. Tessitore testified that "[t]he vast majority of [his] criminal interdiction stops have been on Interstate 80." App. 66. And Tessitore also testified that, in his experience, New York is a "big source city" and Cleveland is a "destination city" for narcotics. App. 75; *see also Garner*, 961 F.3d at 274 (New York City as "a known drug hub"). According to Tessitore, "if somebody is traveling from New York to Cleveland" on I-80, "it heightens [his] awareness that they could be trafficking narcotics." App. 75. The District Court did not err in citing this factor as well.

6

Finally, the air freshener hanging from Stewart's rear-view mirror was a factor that, taken with the others, contributed to reasonable suspicion under the totality of the circumstances. Tessitore noticed the air freshener when he first approached to ask for Stewart's driver's license and vehicle registration. As Tessitore testified and as courts have recognized, air fresheners "are often used to mask the smell of narcotics." *United States v. Foreman*, 369 F.3d 776, 784 (4th Cir. 2004). We have found that air fresheners contributed to an officer's reasonable suspicion. *See Garner*, 961 F.3d at 271–72. Of course, absent other factors, a single air freshener is innocuous. But here,

14

where Tessitore "found the presence of the air freshener suspicious" in a third-party vehicle that had tinted windows—a vehicle whose driver gave unusual answers and had been arrested by the DEA—the air freshener helped establish reasonable suspicion. *United States v. Foley*, 206 F.3d 802, 804 (8th Cir. 2000).

*   *   *

In *Green*, we held that the defendant's misleading statements, the smell of marijuana in his vehicle, and his criminal history together sufficed for reasonable suspicion to extend a stop. *See* 897 F.3d at 184–85. And in *Garner*, we concluded that several air fresheners, travel along a known drug corridor, an expired car rental agreement, and the driver's extreme nervousness collectively showed that the officer's suspicion was reasonable. *See* 961 F.3d at 271–72. Here, we hold that Trooper Tessitore had reasonable suspicion of illegal activity based on these factors: Stewart's inconsistent and evasive answers to Tessitore's questions, Stewart's darkly tinted car windows, the registration of his vehicle to a third party, his prior arrests, his travel along a known drug corridor, and the air freshener in his vehicle. Because Stewart's Fourth Amendment rights were not violated under *Rodriguez*, we will affirm.

15

_____

FREEMAN, *Circuit Judge*, concurring.

I agree that Trooper Tessitore had reasonable suspicion of criminal activity when he extended the length of the traffic stop beyond the 15-minute-30-second mark. As the majority opinion states, the cumulative weight of six factors established reasonable suspicion. Maj. Op. at 9. I write separately to emphasize that we must independently evaluate the inferences that law enforcement officers make from the facts and assign those inferences "due weight." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). For instance, on this record, and in the totality of the circumstances, Tessitore reasonably inferred that the air freshener hanging from Stewart's rear-view mirror was suspicious. But I would give that inference minimal weight.

At the suppression hearing, Tessitore's testimony about air fresheners pertained to circumstances arising both before and after the presumed *Rodriguez* moment. He first mentioned air fresheners when discussing what he observed when he approached Stewart's vehicle, about two minutes into the traffic stop. He noticed "extremely dark windows" and sunshades in the rear passenger area that were all lowered, "making it extremely dark inside the interior of the vehicle." App. 73. He testified that those attributes, in his experience, indicated hidden compartments in the vehicle. Then he added, "I did notice a Black Ice air freshener hanging from the rear view mirror. *Later on during my search*, I would find several additional air fresheners, which are commonly used to mask odors of narcotics, to try to throw off a narcotics detection canine." App. 73–74 (emphasis added). He found

those additional air fresheners while *searching* Stewart's vehicle—after his traffic-infraction investigation concluded—so any inferences he drew from those air fresheners are irrelevant to whether it was lawful for him to extend the traffic stop beyond the time needed to investigate a traffic infraction. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("Authority for the seizure [for a suspected traffic violation] . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

Later in his testimony, Tessitore was presented with a photograph of the single air freshener. He identified it for the record and said, "Again, air fresheners are common with narcotics trafficking to mask odors and . . . deter the drug detection canine from alerting to the odor of narcotics." App. 119–20. He added that the additional air fresheners he found during the *search* of Stewart's vehicle had two different scents—Black Ice and "new car smell"—which "generally don't go together, so they're just there as a masking agent[,] not for an enjoyable smell, if you're mixing the two together." App. 120.

When the District Court denied the suppression motion, it (properly) addressed only the single air freshener that Tessitore spotted before the *Rodriguez* moment. It listed the air freshener as one of the "numerous factors" that caused Tessitore to suspect that criminal activity was afoot. App. 40. Construed in the government's favor, *United States v. Garner*, 961 F.3d 264, 269 (3d Cir. 2020), the record demonstrates that Tessitore found the single air freshener (disaggregated from the several additional air fresheners he later found in the vehicle) suspicious.

But our reasonable suspicion inquiry is an objective one, based on the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("[T]he touchstone of the Fourth

2

Amendment is reasonableness . . . [which] is measured in objective terms by examining the totality of the circumstances." (cleaned up)). So we do not defer to an officer's subjective suspicion or assume that an officer's inferences are reasonable.

To be sure, law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (cleaned up). But when courts evaluate those inferences, we undertake a two-step process. First, we consider the totality of the circumstances and decide whether the inferences are reasonable.[1] *Id.* at 277 (concluding that an officer's inference was reasonable based on information available to him, his observations, and his experience, and that the facts supported an additional "commonsense inference"); *Kansas v. Glover*, 140 S. Ct. 1183, 1188–89 (2020) (assessing whether the law enforcement officer's inferences were reasonable). Second, we assign "due weight" to an officer's reasonable inferences. *Arvizu*, 534 U.S. at 277; *see Ornelas v. United States*, 517 U.S. 690, 699 (1996) (requiring reviewing courts to "give due weight to inferences drawn from [the] facts by resident judges and local law enforcement officers").[2]

---

[1] Assessing the reasonableness of an inference is distinct from evaluating whether a given fact is subject to a plausible innocent explanation. We will not dismiss a fact simply because, in isolation, it is "readily susceptible to an innocent explanation." *Arvizu*, 534 U.S. at 274 (rejecting the "divide-and-conquer analysis").

[2] *But see Arvizu*, 534 U.S. at 278 (Scalia, J., concurring) ("I do not see how deferring to the District Court's factual inferences (as opposed to its findings of fact) is compatible with *de novo* review.").

3

In my view, it was reasonable for Tessitore to infer that the air freshener in Stewart's vehicle—in combination with the other factors discussed in the majority opinion (particularly Stewart's evasive answers and the "extremely dark" interior of the vehicle)— might be intended to throw off narcotics-sniffing dogs. Nonetheless, on this record, I give this inference minimal weight in the totality of the circumstances.

Recall that, before the *Rodriguez* moment, Tessitore only saw a single air freshener hanging from Stewart's rearview mirror. Air fresheners are ordinary, everyday car accessories. And nothing about the air freshener in Stewart's vehicle was unusual enough to arouse suspicion. These circumstances are unlike those in *United States v. Garner*, where the officer testified that "he smelled a strong odor of air freshener and saw air fresheners clipped on every vent, which was abnormal in his experience." 961 F.3d at 272. These circumstances are also unlike what the Fourth and Eighth Circuits addressed in cases where air fresheners supported reasonable suspicion. *See United States v. Foreman*, 369 F.3d 776, 778 (4th Cir. 2004) ("Trooper Wade observed two traffic infractions: (1) excessive speed and (2) *several air fresheners*, hanging from the rearview mirror, *obstructing the driver's windshield view*, each in violation of Virginia state law." (emphases added)); *United States v. Foley*, 206 F.3d 802, 804 (8th Cir. 2000) ("Trooper Peck observed an air freshener hanging from the rear view mirror. Based on his experience, Trooper Peck found the presence of the air freshener suspicious *in a rented vehicle*." (emphasis added)).

Here, I would conclude that Tessitore had reasonable suspicion to extend the stop beyond the *Rodriguez* moment even if I gave his inference about the air freshener no

4

weight.  But in some cases, courts will need to address the weight due to each inference that contributes to reasonable suspicion.  And when we do that, we must take care not to assign undue weight to inferences drawn from commonplace, otherwise innocuous factors such as an accessory found in millions of vehicles in the United States.