**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-2354
_____

UNITED STATES OF AMERICA

v.

JAIRO BENJAMIN RIVERA-RAPOSA,
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:22-cr-00199-001)
District Judge:  Honorable Robert D. Mariani
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 24, 2025
_____

Before:  CHAGARES, <u>Chief</u> <u>Judge</u>, MONTGOMERY-REEVES and MCKEE, <u>Circuit</u>
<u>Judges</u>

(Filed: May 19, 2026)
_____

OPINION*
_____

---

\* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does
not constitute binding precedent.

CHAGARES, Chief Judge.

Jairo Benjamin Rivera-Raposa pled guilty to possession with intent to distribute 500 grams or more of cocaine recovered from his vehicle after a traffic stop. Before pleading guilty, he moved to suppress evidence obtained from a search of his vehicle on the ground that the searching state police troopers impermissibly strayed from the original mission of the traffic stop. The District Court denied the motion to suppress following an evidentiary hearing, and Rivera-Raposa now appeals. Because we conclude that Rivera-Raposa's arguments are without merit, we will affirm the decision of the District Court.

## I.[1]

On March 24, 2022, Rivera-Raposa was stopped by Pennsylvania State Police Troopers Brian Konopka and Robert Borkowski while he was traveling along Interstate 380, which Trooper Konopka understood to be a known drug-trafficking corridor. While on patrol, Trooper Konopka noticed that Rivera-Raposa's white Mazda SUV had windows that were tinted beyond the level permitted by Pennsylvania law. The SUV also had a license plate with a number indicating that it had been recently registered in New York and appeared to belong to a car dealership located on Jerome Avenue in the Bronx, New York, which Trooper Konopka understood to be a drug-trafficking hub. Trooper Konopka stopped the SUV and asked the defendant, who was the sole occupant of the vehicle, for his driver's license. It was raining and tractor trailers were passing by on the

---

[1] We write primarily for the parties and recite only the facts essential to our decision.

2

interstate. Accordingly, Trooper Konopka very briefly leaned his head slightly through the passenger window while asking Rivera-Raposa questions.

Trooper Konopka asked Rivera-Raposa where he was going while the defendant procured his license. Rivera-Raposa paused before answering that he was going to Syracuse. In response to follow-up questions about his travel plans, Rivera-Raposa explained that he was a phlebotomist traveling to Syracuse to administer an at-home COVID-19 test. Rivera-Raposa appeared nervous and was shaking.

Trooper Konopka then leaned his head through the window and asked the defendant about a garbage bag at the foot of the passenger seat.[2] Appendix ("App.") Volume III ("Video") at 2:25. Rivera-Raposa did not directly respond to the question but instead rolled down the back passenger window and gestured toward the back seat.[3] Trooper Konopka peered through the back window without placing his head inside the vehicle and observed (1) a sharps disposal container with a capacity of several gallons that was "almost overflowing" with tubes apparently filled with blood and (2) a medical tool bag that was stored in an unsanitary manner and filled with used needles and vials, some of which had blood. App. 28. Trooper Konopka stated that he found Rivera-Raposa's story to be highly suspicious, especially in light of the unsanitary nature of the tool bag.

---

[2]    At various other times during their conversation, Trooper Konopka's head or arm entered the vehicle.

[3]    Later, when Trooper Konopka again asked the defendant what the garbage bag was, Rivera-Raposa responded, "Nothing, it's garbage," and moved it to the back seat. App. 28.

3

Trooper Konopka then asked Rivera-Raposa for the vehicle registration and proof of insurance, at which time Rivera-Raposa handed Trooper Konopka a copy of his driver's permit, but not his driver's license. Trooper Konopka's standard practice during traffic stops was to ask drivers for their license, registration, and proof of insurance, and in this case, he also sought that information to determine whether Rivera-Raposa owned the SUV. Trooper Konopka testified that drug trafficking organizations frequently use dealer tags and fraudulent temporary registrations to "maintain . . . clandestinity" and "avoid police detection." App. 28. In response to Trooper Konopka's request, Rivera-Raposa provided his driver's license before continuing scrolling on his phone.

Trooper Konopka testified that, at this point, he thought that Rivera-Raposa was looking on his phone for proof of insurance. Trooper Konopka continued asking Rivera-Raposa about his employment, and at one point, he reached into the vehicle to point to an employee identification card hanging from the rearview mirror and asked, "Is that the company you work for, this?" Video at 3:30–33. Rivera-Raposa responded that he worked for two companies. In response to further inquiry, Rivera-Raposa confirmed that he made house calls but did not audibly respond when asked whether he always worked out of upstate New York.

Eventually, Trooper Konopka asked Rivera-Raposa what he was looking for, but Rivera-Raposa did not give an intelligible response. Trooper Konopka subsequently asked Rivera-Raposa to accompany him to his patrol car, where he continued to ask the defendant questions about the vehicle, his employment, and his travel.

Approximately thirteen minutes after Trooper Konopka first began speaking with Rivera-Raposa, Trooper Konopka asked if he could search the defendant's vehicle. Rivera-Raposa denied consent to search his vehicle. Trooper Konopka requested a canine unit approximately twenty-four minutes into the stop, and the defendant agreed to a canine search of the vehicle. The dog alerted to the presence of narcotics or marijuana inside the vehicle, and a subsequent search revealed the presence of 4.5 kilograms of cocaine.

A grand jury subsequently returned an indictment charging the defendant with one count of possession with intent to distribute 500 grams or more of cocaine. Rivera-Raposa moved to suppress the fruits of the search of his vehicle, and the District Court denied that motion. The District Court held that even if Trooper Konopka had extended the stop beyond the scope of his original mission, that extension was supported by reasonable suspicion.

After the District Court denied the motion to suppress, Rivera-Raposa entered a conditional plea of guilty, whereby he pled guilty under the condition that he be allowed to withdraw his guilty plea if his appeal of the denial of the suppression motion was successful. The District Court sentenced the defendant to a term of imprisonment of forty-six months. Rivera-Raposa timely appealed.

II.[4]

The Fourth Amendment protects "against unreasonable searches and seizures."

---

[4] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

U.S. Const. amend. IV. In Rodriguez v. United States, 575 U.S. 348 (2015), the Supreme Court explained that a traffic stop is unreasonable if it extends beyond the duration required to accomplish the mission of "address[ing] the traffic violation that warranted the stop and attend[ing] to related safety concerns." 575 U.S. 348, 354 (2015) (citation omitted). If the stop extends past this point — often called the Rodriguez moment — that extension violates the Fourth Amendment unless it is supported by independent reasonable suspicion. See id. at 353–54.

"Whether a traffic stop was unlawfully extended is a question of law" over which we exercise de novo review. United States v. Hurtt, 31 F.4th 152, 158 n.45 (3d Cir. 2022). We review the District Court's factual determinations for clear error. United States v. Clark, 902 F.3d 404, 409 (3d Cir. 2018). Because we conclude that the District Court's factual determinations were not clear error, we base our factual discussion on the District Court's opinion denying the motion to suppress. See id. ("We view the evidence presented in the light most favorable to the District Court's ruling[.]").

Rivera-Raposa argues that Trooper Konopka went off-mission by leaning into his car and asking him questions about his employment while Rivera-Raposa searched for his driver's license. The District Court did not clearly err, however, in finding that Trooper Konopka did not veer off-mission when he first leaned into the passenger side of the window, immediately before asking Rivera-Raposa for his driver's license. Rivera-Raposa also argues that Trooper Konopka's later visual searches of the vehicle's interior and the employment questions violated the Fourth Amendment. Rivera-Raposa suggests we cannot consider Trooper Konopka's visual observations and employment questions

6

when determining whether he had reasonable suspicion to extend the search. We need not address this argument because, as the District Court held, reasonable suspicion had already been established by the time Trooper Konopka leaned into the car to point to the employee ID card.

Moreover, to the extent that any of Trooper Konopka's visual searches were off-mission, they were supported by independent reasonable suspicion. In evaluating whether reasonable suspicion supports the extension of a traffic stop, we look to the "totality of the circumstances" and ask whether "a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying" the extension. United States v. McCants, 952 F.3d 416, 422 (3d Cir. 2020) (alteration in original) (quoting United States v. Brown, 448 F.3d 239, 246–47 (3d Cir. 2006)). We listed several factors in United States v. Stewart that, taken together, established reasonable suspicion to extend a traffic stop past the Rodriguez moment: (1) the defendant "provided evasive, inconsistent, and downright puzzling answers" to the officer's inquiries regarding his travel; (2) he was nervous and avoided eye contact; (3) the windows of the defendant's vehicles were darkly tinted; (4) the defendant was driving a car registered to another person; (5) the defendant had an arrest record; (6) he was "traveling along a well-known drug smuggling corridor"; and (7) he had an air freshener, which although otherwise innocuous, could be used to mask the smell of narcotics. 92 F.4th 461, 468 (3d Cir. 2024); see also id. at 469–471.

Like Stewart, Rivera-Raposa was stopped while driving in "a well-known drug smuggling corridor" with heavily tinted windows. Id. at 468. He also offered "evasive,

7

inconsistent, and downright puzzling answers" when Trooper Konopka asked about his destination and the purpose of his travel. Id. Rivera-Raposa gave a "delayed response" when Trooper Konopka asked his destination. App. 139. His explanation of the reason for his trip — that he was traveling interstate to conduct a COVID-19 test that required a phlebotomist to administer — was "highly suspicious." App. 143. And Rivera-Raposa exhibited "several nervous behaviors." App. 141. He was "physical[ly] shaking," and when asked for his driver's license, he first provided his driver's permit, which did not authorize him to drive alone. Id.

In addition, Trooper Konopka ran Rivera-Raposa's license plate number before pulling him over and learned that the vehicle had been recently registered to an address in the Bronx that Trooper Konopka understood be in an area known as a drug-trafficking hub. Trooper Konopka further testified that, based on his training and experience, he knew that drug organizations frequently re-register their vehicles to make them more difficult to track. While the mere fact that the officer believed the vehicle to be registered to an address in a drug-trafficking hub might not suffice to establish reasonable suspicion, the fact that the vehicle had been recently re-registered to that address was one factor contributing to reasonable suspicion. See United States v. Leon, 80 F.4th 1160, 1169 (10th Cir. 2023) (noting that the recent re-registration of a vehicle, while afforded limited weight, may contribute to a finding of reasonable suspicion).

When coupled with Rivera-Raposa's suspicious behaviors, this sufficed to raise the suspicions of "a reasonable, trained officer standing in [Trooper Konopka's] shoes." McCants, 952 F.3d at 422 (quoting Brown, 448 F.3d at 246–47). Accordingly, we hold

that the totality of the circumstances established reasonable suspicion, and the District Court did not err in holding that any extensions of the traffic stop beyond its original scope did not violate the defendant's Fourth Amendment rights.

III.

For the foregoing reasons, we will affirm the judgment of the District Court.