**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1631
_____

UNITED STATES OF AMERICA

v.

RAPHAEL ROSS,
Appellant
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 2:21-cr-00200-001)
District Judge: Honorable Eduardo C. Robreno
_____

Argued on April 30, 2025

Before: KRAUSE, BIBAS, and MONTGOMERY-REEVES,
*Circuit Judges*

(Opinion filed:  August 19, 2025)

Abigail E. Horn **[ARGUED]**
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

*Counsel for Appellant*

Sara Solow **[ARGUED]**
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

Traffic stops, by their very nature, are tense and often awkward affairs. The officer walks up to the car knowing little about the driver behind the wheel. The driver, meanwhile, knows he is not free to leave. So some conversation is inevitable. But under *Rodriguez v. United States*, 575 U.S. 348 (2015), not all conversation is constitutionally equal. The Fourth Amendment permits conversation that furthers the stop's mission, including questions related to processing the infraction and officer safety, but it shuns inquiries that turn the stop into a roving criminal investigation—unless independently supported by reasonable suspicion.

Here, Appellant Raphael Ross argues that the guns and drugs found in his vehicle during a routine traffic stop should have been suppressed because the officer's conversation—complimenting Ross's watch and asking him where he worked—exceeded Fourth Amendment bounds. He is mistaken. Because the watch-and-job exchange, which lasted mere seconds, furthered the stop's mission of ensuring officer safety, we will affirm the denial of Ross's suppression motion and his subsequent conviction.

## I. Background

### A. Factual Background[1]

On January 15, 2021, Philadelphia Police Department (PPD) Officers John Smart and Danielle Foreman were patrolling an area in South Philadelphia known for violent crime and narcotics sales. Around 7:30 pm, the officers pulled over a car that had windows tinted in violation of state law and that, it turned out, was driven by Ross.[2] Once the car came to a stop, the officers approached by foot, with Officer Smart at the driver side and Officer Foreman at the passenger side.

---

[1] The facts here are taken from the District Court's findings of fact and are supplemented by undisputed facts in the record, unless noted otherwise. *See infra* note 3. And "[b]ecause the District Court denied the suppression motion," we recount "the facts in the light most favorable to the Government." *United States v. Stewart*, 92 F.4th 461, 466 (3d Cir. 2024).

[2] Ross does not dispute that his windows were excessively tinted, in violation of 75 Pa. Stat. and Cons. Stat. § 4524(e).

3

Officer Smart first explained to Ross the reason for the stop and then "asked him for his license, registration, and proof of insurance." App. 110. After "Ross produced expired insurance and vehicle registration cards" and explained that he "left [his license at someone's] house," App. 466, Officer Smart reassured Ross "that if everything . . . checked out" with his documents, he "wouldn't be issued a ticket and . . . would be on his way" with just "a warning," App. 190, 193.

During this initial exchange, "both officers observed in Ross signs of anxiety and nervousness including shaking hands, stammering voice, quivering lips, heavy breathing, and a refusal to make eye contact." App. 466. Ross also "started to fumble and rummage around the middle of the cabin" and erratically move his jacket around the car—shifting it from the passenger seat, over to his lap, and then positioning it over the center console. *Id.* Ross claimed that he was looking for his license, but neither officer believed him because Ross "had already told [them] that he had left it at home" and "it did not look like [he] was actually looking for anything in the jacket but was instead simply moving it around in an odd way." App. 466–67.

Before going back to his patrol vehicle to verify Ross's information, Officer Smart complimented the Rolex watch Ross was wearing and "asked [Ross] where he worked." App. 466.[3] Ross thanked him and "answered that he owned a home

---

[3] Whether the watch-and-job exchange occurred before, during, or after the Officers first observed Ross fumbling with his jacket is unclear from the District Court's findings of fact and the record. That said, because we must "view the facts in

4

health aide business." *Id.* Officer Smart promptly returned to the patrol car to conduct the records checks, while Officer Foreman walked over to the driver's side window. In total, this initial interaction lasted between 1–3 minutes, with the watch-and-job exchange lasting around five seconds.

Back at the police cruiser, Officer Smart ran the usual database checks to verify Ross's identity and license status. Those checks brought up Ross's lengthy rap sheet, which notably included a recent arrest for firearm possession. Recognizing the arresting officer's name, Officer Smart phoned that colleague for the story behind the charge and learned that Ross had been caught with a gun after he resisted and "fought . . . police officers" during a routine traffic stop. App. 467. The colleague urged Officer Smart to quickly "call for backup," and he took that advice. App. 467. All told, the database queries and call consumed roughly 5–7 minutes.

Meanwhile, Officer Foreman remained at Ross's driver's side window. She tried to strike up a casual conversation with Ross by asking him "about where he was coming from [and] where he was going." Reply Br. 9. Still, "Ross continued to avoid eye contact and to shake, stammer, and breathe heavily while reaching around the center console with his jacket." App. 468. When Officer Foreman asked "why he was nervous," Ross began fishing under the front seat. Reply Br. 9. Twice Officer Foreman told him to plant "his hands on the steering wheel"; twice he ignored her—instead "reaching around" the interior of the car where Officer Foreman "could not see." App. 468. Ross then tried opening

the light most favorable to the Government," we presume it occurred simultaneously or after. *Stewart*, 92 F.4th at 466.

5

the driver's side door until Officer Foreman wedged her body in its path.

Officer Smart rejoined the scene a moment later and "asked Ross whether there were any 'firearms'" or drugs in the car. App. 468. Ross "giggled and said no," but his gaze remained fixed straight ahead, and Officer Smart "observed that Ross continued to appear very nervous and continued to reach towards the center console and move his jacket around." App. 468–69. At this juncture, both officers shared the concern that Ross might be armed.

Backup arrived soon thereafter, and Officer Smart ordered Ross out of the car and frisked him for weapons. Smart found a wad of cash in Ross's back pocket, which Ross claimed was for his grandfather's funeral. Officers Smart and Foreman then frisked the front interior of the car for weapons and recovered a semi-automatic pistol and 136 packets of fentanyl and heroin hidden in the center console.

## B. Procedural History

Based on the contraband found in his car, Ross was charged with: (1) possession of a firearm as a felon,[4] in violation of 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841; and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). He

---

[4] At the time of the traffic stop, Ross was on federal supervised release stemming from two earlier felony convictions— possessing a gun with an obliterated serial number and selling crack cocaine within 1000 feet of a playground.

then sought to exclude that evidence—which, in effect, would have necessitated dismissal of the indictment—by filing a suppression motion in the District Court. Relying on *Rodriguez*, Ross contended that the officers impermissibly extended the duration of the stop, in violation of the Fourth Amendment, when Officer Smart asked him about his employment.

At the suppression hearing, both officers recounted how the stop had played out. Officer Foreman, who has pulled over "ton[s]" of other drivers, testified that Ross was in the "top five" most nervous drivers with whom she had ever interacted. App. 113. Officer Smart, who himself had previously "conducted hundreds of traffic stops," similarly described Ross as unusually and "extremely nervous" and explained that he "complimented [Ross's] watch" as "an icebreaker to calm him down [and] find a common ground of conversation." App. 190, 192. He also testified that he "always make[s] simple conversation" during traffic stops to help drivers feel "more comfortable and relaxed" instead of "nervous . . . and tense." App. 253.

The District Court denied Ross's motion. It credited the officers' testimony and concluded that the brief watch-and-job exchange was mere "small talk" designed to "'calm [Ross] down'" and thus did not amount to a "*Rodriguez* moment." App. 466, 473 (alteration in original). And it concluded that the subsequent frisk of Ross and his car was consistent with the Fourth Amendment because, by that time, the officers had reasonable suspicion that Ross was armed or had a gun within his reach.

Ross subsequently pleaded guilty to all three counts but preserved his right to challenge the denial of the motion to suppress. Having been sentenced to 120 months' imprisonment and a three-year term of supervised release, Ross now timely appeals the denial of his suppression motion.[5]

## II. Discussion[6]

Ross contends that the District Court erred by denying his motion to suppress because the watch-and-job exchange violated the Fourth Amendment. We exercise plenary review over a district court's legal determinations and review its factual findings for clear error. *United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018). "Whether a traffic stop was

---

[5] Although Ross also argues that 18 U.S.C. § 922(g)(1) is unconstitutional facially and as applied to him, he concedes that his challenge is "currently precluded for two reasons." Opening Br. 24. He is correct. First, because he failed to preserve this argument, we review for plain error, *United States v. Dorsey*, 105 F.4th 526, 528 (3d Cir. 2024), and it is far from obvious under our caselaw that disarming a person with firearm and drug-trafficking convictions violates the Second Amendment, *see Pitsilides v. Barr*, 128 F.4th 203, 213 (3d Cir. 2025) (explained that drug trafficking is the kind of conviction that justifies disarmament). Second, because Ross possessed a firearm while serving a term of federal supervised release, his facial and as-applied challenge to § 922(g)(1) is foreclosed by *United States v. Moore*, 111 F.4th 266, 273 & n.5 (3d Cir. 2024), and *United States v. Quailes*, 126 F.4th 215, 221 (3d Cir. 2025).

[6] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. §§ 1291 and 3742(a).

unlawfully extended is a question of law" that we review *de novo*. *United States v. Hurtt*, 31 F.4th 152, 158 n.45 (3d Cir. 2022). And because the motion to suppress was denied, we must "view the facts in the light most favorable to the Government" and draw reasonable inferences in its favor. *United States v. Garner*, 961 F.3d 264, 269 (3d Cir. 2020).

### A.    *Rodriguez* **Framework**

Traffic stops—however brief—are seizures, so the Fourth Amendment requires they "be '[]reasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). A traffic stop is reasonable at its inception when an officer has reasonable suspicion to believe that the motorist committed a traffic violation. *United States v. Delfin-Colina*, 464 F.3d 392, 396–97 (3d Cir. 2006). Like a *Terry* stop, however, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'— to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). For that reason, a lawful traffic stop that was justified at the outset only by a traffic violation transforms into an unconstitutional seizure "if it is prolonged beyond the time reasonably required to complete" that dual mission. *Id.* at 350–51 (quoting *Caballes*, 543 U.S. at 407).

Under *Rodriguez*, inquiries that further the stop's mission, when made with reasonable diligence, do not unreasonably prolong the stop and thus are permitted under the Fourth Amendment. "Beyond determining whether to issue a traffic ticket," on-mission tasks include "ordinary inquiries incident to [the traffic] stop," such as "checking the driver's

9

license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (quoting *Caballes*, 543 U.S. at 408). "Tasks tied to officer safety are also part of the stop's mission when done out of an interest to protect officers." *Clark*, 902 F.3d at 410. This includes ordering drivers and passengers out of the car, even in the absence of any articulable suspicion of possible danger, *Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997), "asking limited questions directed at ensuring officer safety," *United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020), conducting "routine criminal record check[s]," even if they take several minutes, *United States v. Hunter*, 88 F.4th 221, 225–26 (3d Cir. 2023), and other "negligibly burdensome precautions" reasonably taken to safely complete the stop, *Rodriguez*, 575 U.S. at 356, as well as "delays caused by safety concerns related to the stop," *Garner*, 961 F.3d at 271.

In contrast, "measure[s] aimed at detect[ing] evidence of ordinary criminal wrongdoing," including a dog sniff, "safety precautions taken in order to facilitate" on-scene "investigation into other crimes," and other fishing expeditions fall outside of the scope of the stop's mission of processing the ticket and ensuring roadway safety. *Rodriguez*, 575 U.S. at 355–56 (cleaned up). At the moment when an off-mission inquiry measurably prolongs a stop—sometimes called the "*Rodriguez* moment"—the officers must have developed "reasonable suspicion" of criminal activity independent of the traffic violation itself. *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018). Otherwise, the extension of the stop violates the Fourth Amendment.

"There is no *de minimis* exception to t[he] rule" in *Rodriguez*. *Clark*, 902 F.3d at 410. So *any* off-mission task that "measurably extend[s] the duration of the stop" beyond the time it "reasonably should have been . . . completed" is unlawful unless supported by reasonable suspicion. *Rodriguez*, 575 U.S. at 354–55 (cleaned up). But even so, *Rodriguez*'s standard accommodates the on-the-ground realities of a roadside seizure, for the "acceptable length of a routine traffic stop . . . cannot be stated with mathematical precision." *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017) (cleaned up). Accordingly, "fleeting[]" off-mission inquiries lasting "mere seconds" typically will "not measurably prolong the stop." *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023).[7] As more seconds tick by, however, the risk of unlawful prolongation increases.[8]

_____

[7] *See, e.g.*, *United States v. Puckett*, 139 F.4th 730, 739 (8th Cir. 2025) (concluding that "20 seconds of [off-mission] questioning did not prolong the stop beyond the time that it" reasonably should have lasted); *United States v. Buzzard*, 1 F.4th 198, 204 (4th Cir. 2021) (finding that a single question asked "mid-stop" "didn't extend the stop by even a second"); *People v. Chavez–Barragan*, 379 P.3d 330, 337 (Colo. 2016) (holding that "brief off-topic questions" about guns, drugs, and stolen goods "did not transform the traffic stop into a seizure of unreasonable duration").

[8] *See, e.g.*, *Rodriguez v. United States*, 575 U.S. 348, 352 (2015) (holding that a "seven or eight minute" delay was a measurable extension); *United States v. Campbell*, 26 F.4th 860, 885 (11th Cir. 2022) (en banc) (concluding that off-mission questioning lasting "approximately twenty-five seconds" measurably extended a stop); *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (assuming "five

11

Under *Rodriguez*, therefore, an unlawful seizure occurs when an officer (1) diverts from the infraction-and-safety-based mission of the stop to investigate other criminal conduct, (2) in a way that meaningfully prolongs the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion. *Green*, 897 F.3d at 179.

## B. Officer Questioning Under *Rodriguez*

Ross does not contest the legality of the initial stop—he argues instead that Officer Smart impermissibly extended the scope and duration of the stop when he complimented Ross's Rolex and asked Ross what he did for a living. Although *Rodriguez* draws a bright line between on and off mission inquiries, this dispute highlights how some conversations evade easy classification. The parties and the District Court, for example, characterize the watch-and-job exchange in three distinct ways: The District Court concluded it was mere "small talk," App. 466; Ross argues it marked the launching of a "criminal investigation," Opening Br. 12; and the United States describes it as having been "made to calm the defendant and avoid an escalation," thus falling squarely in the realm of safety-related activities blessed by *Rodriguez*, Answering Br. 26.

Despite the prevalence of casual exchanges during routine traffic stops on matters facially unrelated to the traffic

---

minutes" of off-mission questioning "measurably extended the traffic stop"); *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019) (finding that "several minutes of [off-mission] questioning" was an unlawful extension).

12

infraction or safety, including employment,[9] the outer bounds of such roadside "small talk" remain hazy after *Rodriguez.* Having benefited from superb oral advocacy on both sides of this case, we aim to bring clarity to those boundaries here. While this Court has not explicitly advanced a framework for categorizing police questions during a routine traffic stop, we have implicitly recognized that roadside questioning can be placed into the four categories discussed below, three of which pass constitutional muster, and the fourth of which, if not supported by reasonable suspicion that the driver has committed a crime independent of the traffic violation, violates the Fourth Amendment.

1. *Small Talk*:  The first category is pure small talk, encompassing anodyne conversation that carries no constitutional significance and instead simply rides sidecar to the stop's mission.  This encompasses common greetings and courtesies, including in the form of questions.  As Ross recognizes, "pleasantries about the weather" or innocuous compliments like "nice Eagles jersey," for instance, have no constitutional significance. Reply Br. 4.  Such social graces are neither investigatory in nature, nor do they meaningfully prolong the stop.  They are customary cultural expectations and practices.  Nothing in the Constitution requires officers to behave like robotic "automatons" or demands "stony silence"

---

[9] *See, e.g.*, *United States v. Englehart*, 811 F.3d 1034, 1037 (8th Cir. 2016); *United States v. Williams*, No. CR 22-418, 2023 WL 6626126, at *5 (E.D. Pa. Oct. 11, 2023); *United States v. Stewart*, No. 3:18-CR-00310, 2021 WL 2478440, at *2 (M.D. Pa. June 17, 2021), *aff'd,* 92 F.4th 461 (3d Cir. 2024); *United States v. Romero-Mendez*, No. 116-CR-00204, 2018 WL 2191540, at *2 (S.D. Ind. May 14, 2018).

on the side of the road. *United States v. Steinman*, 130 F.4th 693, 707 (9th Cir. 2025). So long as small talk occurs in the flow of the stop, it poses no Fourth Amendment problem. *See, e.g.*, *Green*, 897 F.3d at 176–77 (officer's forty-second inquiry of "How you doin' today?" and why the person was driving from Philadelphia was not a *Rodriguez* moment); *United States v. Mason*, 628 F.3d 123, 131 (4th Cir. 2010) ("[Q]uestions about the weather or simply 'How 'bout them Georgia Bulldogs?' do not implicate the Fourth Amendment" unless extended "beyond the period reasonably necessary to effectuate the purposes of the lawful detention").

2. *Infraction-Related Inquiries*: The second category includes questions aimed at assessing whether the driver is legally on the road and processing the ticket. This includes, among other things, requests for license, registration, and proof of insurance; questions about the traffic infraction; and context-framing inquiries about the driver's travel history and plans. *See Garner*, 961 F.3d at 271; *United States v. Yusuf*, 993 F.3d 167, 182 (3d Cir. 2021); *Clark*, 902 F.3d at 411 (suggesting that an officer may "ask[] questions" to "test[] a driver's candor about his authority to operate a vehicle"). Even if some of these stop-related questions might incidentally reveal more than the officer bargained for, they remain "ordinary inquiries incident to [the traffic] stop" and thus squarely on-mission under *Rodriguez*. 575 U.S. at 355 (alteration in original) (quoting *Caballes*, 543 U.S. at 408).

Employment questions may fall in this category, depending on context. This Court has held, for instance, that an officer can ask "questions about the driver's occupation" to assess a driver's sobriety during a DUI stop. *Hurtt*, 31 F.4th at 161. Other observations or the context of preceding

14

conversation might also render such inquiry unremarkable. As recognized by our sister circuits, for example, if a driver volunteers that he is traveling for work, asking the driver "about what he d[oes] for a living" falls "comfortably within the bounds of reasonable follow-up questions." *United States v. Dion*, 859 F.3d 114, 118, 126 n.7 (1st Cir. 2017); *see also United States v. Cole*, 21 F.4th 421, 433 (7th Cir. 2021) (en banc) ("[Because the driver] initially volunteered his occupation . . . in response to a question about his license and registration and repeatedly returned to it when explaining his travel and living situation, . . . it was reasonable for [the officer] to ask a few follow up questions about it.").

3. *Safety-Related Inquiries*: Officer and roadway safety is mission-critical. *Rodriguez*, 575 U.S. at 356. So "question[s] related to officer safety a[re] related to the traffic stop's mission." *United States v. Buzzard*, 1 F.4th 198, 203 (4th Cir. 2021). Questions directly tied to officer safety, such as asking the driver whether there are any passengers in the car or if he has any weapons on him, are always permitted on officer-safety grounds. *See, e.g.*, *Taylor*, 60 F.4th at 1240. The same is true of brief, direct questioning about the driver's past arrests, criminal record, or "parole status"—asked before the officer conducts a computerized criminal history check— because knowing a driver's criminal background helps officers "assess[] potential risks involved in a traffic stop" and gauge what "additional precautions" may be necessary. *United States v. Ramirez*, 98 F.4th 1141, 1144–45 (9th Cir. 2024); *see also United States v. Cone*, 868 F.3d 1150, 1153–54 (10th Cir. 2017) (concluding that "criminal-history questions [a]re not unreasonable under the Fourth Amendment" when the requested information does "not exceed the scope of what a computer check would reveal"); *cf. Clark*, 902 F.3d at 410–11

(concluding that extensive criminal history questioning, performed after officer conducted computerized criminal history check, was "not tied to the traffic stop's mission" because the officer already knew the answers to his questions).

But direct questioning is not the only safety-driven dialogue permitted by the Fourth Amendment. Brief, casual questioning aimed at gauging risks or deescalating a situation may also qualify as "reasonable precautionary measures during traffic stops to ensure the safety of [officers] and others." *United States v. Weaver*, 9 F.4th 129, 143 n.57 (2d Cir. 2021). Picture a late-night stop: a lone officer, a jittery driver whose hands tremble on the wheel, and an anxious passenger peering from the backseat. Reading the social cues in the moment, an officer might reasonably decide that immediately ordering the driver out of the car or demanding to know whether he is armed would ratchet tension up, not down, and that a few low-stakes, rapport-building questions—"Long day at work?" "Nice pickup; how long have you had it?"—would do more to calm nerves and keep everyone safe. Plus, that kind of safety-related small talk allows for observation of a speaker's coherence, agitation, and impairment—"important clues pertaining to safety" that give the solo officer a read on whether more direct precautions are needed. *Cone*, 868 F.3d at 1153 (quoting *United States v. Holt*, 264 F.3d 1215, 1224 (10th Cir. 2001) (en banc)). Therefore, depending on the circumstances, a few easygoing questions can fall squarely within *Rodriguez*'s allowance for "negligibly burdensome precautions" that advance officer safety. 575 U.S. at 356.

In sum, when asked "out of an interest to protect officers," *Clark*, 902 F.3d at 410, and "supported by objectively reasonable safety concerns," *Hunter*, 88 F.4th at

16

226, some questions that appear on their face unrelated to safety, including employment questions, may nevertheless fall within this category of permissible safety-promoting inquiries, *see, e.g.*, *Cortez*, 965 F.3d at 839 (questions about what driver and "her boyfriend did for a living" and with "whom she was" living were permissible "inquiries directed at ensuring officer safety").

4. *Off-Mission Inquiries*: Questions that cannot be reasonably characterized as relating to roadway safety or the traffic violation fall within the fourth category, which includes inquiries designed "to facilitate" on-scene "investigation into other crimes" and to "detect crime in general or drug trafficking in particular." *Rodriguez*, 575 U.S. at 356–57. Although our objective inquiry under *Rodriguez* is context-dependent, certain questions would hardly serve any other purpose. *See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 885 (11th Cir. 2022) (en banc) (concluding that "Do you have any counterfeit merchandise?" and "Have any dead bodies in your car?" were "fairly obviously . . . precisely the type of questions *Rodriguez* prohibits") (cleaned up); *United States v. Gomez*, 877 F.3d 76, 91 (2d Cir. 2017) (holding that an officer "'detour[ed] from th[e] mission' of the stop" by asking the driver narcotics-related questions "from the moment that [the officer] first approached the [car]" (quoting *Rodriguez*, 575 U.S. at 356)).

Conversely, depending on the facts of a stop, a question that appears off mission on its face may in fact promote safe completion of the stop and thus relate to the stop's mission. In *Buzzard*, for example, the Fourth Circuit concluded that an officer's "single question" near the beginning of the stop—"Is there anything illegal in the vehicle?"—was best understood as

an inquiry about whether there was "anything dangerous in the vehicle" and thus "related to officer safety and . . . the traffic stop's mission" because, in that context, it was asked by a solo officer, who was "outnumbered" during a late-night stop in a high-crime area, and both occupants exhibited "abnormal" behavior. 1 F.4th at 202–04 ("[W]e decline to require such laser-like precision from an officer asking a single question in these circumstances."); *compare United States v. Gorman*, 859 F.3d 706, 711, 715 (9th Cir. 2017) (asking driver "if there was anything illegal in his car" 20 minutes into the stop after the citation was processed and when driver should have been "free to go" was off-mission inquiry). In short, context matters when assessing roadside questioning.

Employment questions, when deployed as a pretext to sniff out unrelated criminal activity, can veer into this investigative lane. As we held in *Garner*, an officer who asked a driver "about his employment" and then followed up with "five minutes" of intense questions about "family, criminal history, and other conduct unrelated to the traffic stop" went off mission because these inquiries could not reasonably be justified on infraction-processing or safety grounds. 961 F.3d at 271. And other courts have repeatedly concluded that an officer's repetitive and in-depth questions about a driver's employment, especially when paired with other probing questions, fall outside the stop's mission. *See, e.g.*, *United States v. Boatright*, 678 F. Supp. 3d 1014, 1037 (S.D. Ill. 2023); *United States v. Carillo Rea*, 393 F. Supp. 3d 1025, 1032–33 (D. Mont. 2019).

To be sure, off-mission questions designed to uncover unrelated criminal conduct are nevertheless permitted, even without reasonable suspicion, when they do not meaningfully

18

"lengthen the roadside detention." *Rodriguez*, 575 U.S. at 354. This situation may arise when the investigatory questioning occurs "simultaneously with tasks that f[a]ll within the mission of the traffic stop," such as when an officer is multitasking, *Steinman*, 130 F.4th at 707, or where one officer expeditiously completes all traffic-related tasks while another officer makes the off-mission inquiries, *see, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (investigative questioning of passenger did "not measurably extend the duration of the stop" because another officer was running the driver's license, insurance, and registration). But if the stop is meaningfully prolonged beyond the time it should reasonably take, the questioning violates the Fourth Amendment unless supported by independent reasonable suspicion. *See Campbell*, 26 F.4th at 885.

\*     \*     \*

Distilling the above case law on *Rodriguez* and officer questioning to practical guidance, questions that initially appear unrelated to officer safety may nonetheless qualify as on-mission, safety-related inquiries when: (1) the officer has an articulable basis for safety concerns grounded in observable facts; (2) the questions in context can be reasonably understood as relating to those safety concerns, such as an effort to defuse tension, assess demeanor, determine the degree of caution needed, or evaluate whether the driver presents a threat; and (3) the officer does not prolong the stop with unrelated follow-up inquiries once reassured. With that framework in mind, we consider whether the watch-and-job exchange fits the bill.

19

## C.     The Watch-and-Job Exchange Did Not Unlawfully Prolong the Stop

Ross concedes that "benign" small talk has "no constitutional significance." Opening Br. 19–20. And he does not contest that Officer Smart and Officer Foreman's actions after the watch-and-job exchange as they processed his tint violation—running of records checks, placing a phone call to a fellow officer, and questioning him about where he was going—were all on-mission measures taken to administer the traffic ticket while ensuring officer safety, in line with *Rodriguez*. But as Ross points out, after complimenting his Rolex, Officer Smart asked him what he did for a living. This question, in Ross's view, transformed otherwise legitimate small talk into an impermissible investigative inquiry. We disagree.

True, because expensive items lacking a verified, legitimate explanation can be used as circumstantial evidence of drug dealing, *see United States v. Chandler*, 326 F.3d 210, 215 (3d Cir. 2003), the watch-and-job exchange, when considered in isolation, could be viewed as a lead-in to an unconstitutional fishing expedition, *see Steinman*, 130 F.4th at 700, 707 (describing officer asking driver "whether he had ever been in any trouble" and "how he obtained the money to purchase his BMW" as "arguably investigatory questioning" but not deciding the question because it "occurred simultaneously with tasks that fell within the mission of the traffic stop" and thus was not a *Rodriguez* moment). But it also could be understood as a simple compliment and "innocuous background question[]" crafted "to assess driver stress, nervousness, and evasiveness to help gauge the degree of caution necessary in conducting a stop," as the Tenth Circuit

20

concluded in *Cortez*, when it held that an officer's questions related to whether the driver "was working," "what her boyfriend did for a living," and with "whom she was" living were "permissible . . . inquiries directed at ensuring officer safety." 965 F.3d at 839. In this case, however, we do not consider the watch-and-job exchange in a vacuum. In reviewing the denial of Ross's motion to suppress, we defer to the District Court's finding of fact and view the evidence in the light most favorable to the Government. *Garner*, 961 F.3d at 269. And in this context, when considering the interaction in its totality, Officer Smart's remarks fall within the zone of constitutionally permissible safety-driven dialogue.

*First*, the officers had "objectively reasonable safety concerns." *Hunter*, 88 F.4th at 226. Ross exhibited clear signs of extreme anxiety and nervousness, including shaking hands, stammering voice, quivering lips, heavy breathing, profuse sweating, and a refusal to make eye contact. As Officer Foreman testified, Ross was "in the top five of how nervous" someone could be—"something was off." App. 113. Beyond that, Ross kept making abnormal hand movements, including erratically shifting his jacket across the seats and center console and fumbling around the interior of his car. His explanation for such movements—that he was looking for his license—was incongruous with both his earlier statements that he left it at home and his shifting of the jacket without checking the pockets. At this point, a reasonable officer would be concerned that Ross "may have committed (or may be about to commit) a serious crime," was preparing to fight or flee, or was "drunk, on drugs, armed, or some combination thereof." *Barnes v. Felix*, 145 S. Ct. 1353, 1361 (2025) (Kavanaugh, J., concurring).

21

*Second*, Officer Smart articulated a non-investigatory reason for his interaction, consistent with social custom, i.e., that he, like many officers in this country, routinely uses small talk to calm "nervous" and "tense" motorists. App. 253. In testimony the District Court credited, Officer Smart explained that he is a fan of watches and that he complimented Ross's Rolex because it was the first thing he noticed and thought it provided a "common ground of conversation." App. 192, 252. Viewing the watch conversation "through a filter of common sense and ordinary human experience," *Cortez*, 965 F.3d at 840 (citation omitted), and drawing reasonable inferences in the Government's favor, as we must, *Garner*, 961 F.3d at 269, it provided a natural entry point of conversation between the two strangers. In this context, we, like the District Court, see the compliment merely as an icebreaker aimed at making Ross "calm" and thus falling within the third category of permissible officer-safety related exchanges under *Rodriguez*. *United States v. Ross*, No. 21-cr-200, 2022 WL 16963247, at *1 (E.D. Pa. Nov. 16, 2022).

Ross points out correctly that the follow-up question about what he did for a living fits less neatly with Officer Smart's asserted interest in reducing the temperature of the stop—but it fits nonetheless. Smart testified that this was his first time seeing a Rolex during a stop, and that, as a watch enthusiast, he was naturally curious about what Ross did for a living—so he reflexively asked Ross about it. That follow-up question, while perhaps inartful, was one a reasonable officer could believe would establish a rapport with a driver, diffuse tension, and "'provide important clues pertaining to safety,' such as nervous or evasive responses." *Cone*, 868 F.3d at 1153–54 (quoting *Holt*, 264 F.3d at 1124). It was also consistent with Officer Smart's other temperature-reducing

22

measures, including telling Ross that he would get off with just a warning if his story checked out.

Ross insists that the watch-and-job exchange was not safety-related because it was neither optimally calming nor soothing. True, the job question might be more appropriate during a cocktail party than a traffic stop. But "[t]raffic stops are very fluid and dynamic encounters between police and ordinary members of the public," and the Fourth Amendment is not blind to the realities of human interaction. *Hunter*, 88 F.4th at 233 (McKee, J., concurring). Nor does it reduce officers' car-side questions to rote recitation. *Cf. Florida v. Powell*, 559 U.S. 50, 60 (2010) (*Miranda*-warning recitation need not be exact). To the contrary, because even routine traffic stops are "inherently risky for police officers," *Barnes*, 145 S. Ct. at 1361 (Kavanaugh, J., concurring), officers must have flexibility in how they navigate around potential safety hazards, *see United States v. Mayville*, 955 F.3d 825, 832 (10th Cir. 2020) (explaining that "the Fourth Amendment does not require officers to use the least intrusive or most efficient means conceivable to effectuate a traffic stop"). Here, "given the importance of officer safety and the Supreme Court's repeated recognition that '[t]raffic stops are especially fraught with danger to police officers,'" *Buzzard*, 1 F.4th at 204 (quoting *Rodriguez*, 575 U.S. at 356), we will not second-guess the officer's reasonable question in the course of a diligently completed stop.

*Third*, neither officer asked any "repetitive," intrusive, or "in depth" questions after the brief exchange. *Cortez*, 965 F.3d at 840. Importantly, Officer Smart did not use Ross's answer as a springboard to justify further inquiry or facilitate a "detour" into investigating unrelated crimes. *Rodriguez*, 575

23

U.S. at 356. After learning that Ross owned a home-health aide business, Officer Smart did not follow up about his work, income, or any other matter beyond the traffic stop itself. *See Cole*, 21 F.4th at 431–32 ("It is only when an officer's follow-up questions go too far and become unreasonable that a stop risks becoming prolonged."). Instead, "apparently satisfied that more precautions were unnecessary, he immediately returned to the business of completing the stop." *Cortez*, 965 F.3d at 839. And once Officer Smart was back at the patrol car "diligent[ly] . . . performing" the tasks related to processing the tint violation, *Yusuf*, 993 F.3d at 182, Officer Foreman, as Ross concedes, had a free pass to ask him any questions she wanted without impermissibly lengthening the stop, *see Arizona*, 555 U.S. at 333. Yet she notably did not use this occasion to question Ross about his home-health-aide business, his watch, his money, or anything related to drug trafficking. Nor did she take any non-verbal steps that might have marked an advancement of an off-mission investigation, such as surveilling his car for evidence of other crimes. Finally, the length of the discussion was minimal—lasting mere seconds—so it was negligibly burdensome.[10] *Hunter*, 88

---

[10] Of course, the brevity of the roadside chat is also relevant to *Rodriguez*'s second prong: Whether the stop was meaningfully prolonged "beyond the time reasonably required to complete th[e] mission." 575 U.S. at 350–51 (alteration in original); *see supra* notes 7 & 8. We need not decide whether the watch-and-job exchange measurably extended the stop, however, because the exchange was "related to officer safety and thus related to the traffic stop's mission," meaning that the job "question didn't extend the stop by even a second." *Buzzard*, 1 F.4th at 203–04; *see Garner*, 961 F.3d at 271 (explaining that

F.4th at 226 (holding that a reasonable safety precaution lasting "approximately two minutes . . . f[e]ll[] squarely within the confines of the stop's mission"). Therefore, the safety-adjacent compliment and question was permissible as it was brief, proportional to the circumstances, and tethered to the moment.

Ross insists that the question was necessarily investigative because both officers automatically assumed he was a drug dealer once he told them he owned a home-health-aide business. True, both officers testified that "home health aide" is a common occupation provided by drug dealers. App. 129, 192. But a permissible question does not transform into an investigative one simply because the driver replies with a potentially incriminating answer. *See Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980) ("[T]he police surely cannot be held accountable for the unforeseeable results of their words or actions."). Whether a particular question was designed to elicit criminal information is an objective assessment, *Hunter*, 88 F.4th at 224, and Ross cannot point to anything in the record suggesting that his answer to the job question influenced the rest of the stop in any way. So viewed objectively, the safety-related small talk was just that—brief conversation to tone down the encounter for the safety of all involved.

\* \* \*

Under *Rodriguez*, when officer questioning leaves the safety lane and merges into investigative territory, that lane switch requires independent reasonable suspicion. Yet

---

"delays caused by safety concerns related to the stop" are "tied to the [stop's] mission").

25

reasonableness remains the touchstone of the Fourth Amendment, and what is reasonable depends on the circumstances of a case. *Lange v. California*, 594 U.S. 295, 301 (2021). When looking at the totality of the circumstances and "view[ing] the facts in the light most favorable to the Government," as we must, *Stewart*, 92 F.4th at 466, the watch-and-job exchange stayed within reasonable limits given the objective safety concerns. In this context, Officer's Smart's compliment and single "question[] is consistent with both the public's expectations regarding ordinary inquiries incidental to traffic stops and taking the least burdensome approach to ensuring officer safety." *Cortez*, 965 F.3d at 839.

## III.  Conclusion

For the foregoing reasons, we will affirm.